Ray FISCHER and Corporate
Tax Management, Inc.,
Petitioners,

v.

CTMI, L.L.C., Mark Boozer, and Jerrod
Raymond, Respondents

No. 13–0977

Supreme Court of Texas.

Argued October 12, 2015

Opinion delivered: January 8, 2016

Rehearing Denied February 19, 2016

C. Gregory Shamoun, Jonathan J. Cunningham, Shamoun & Norman LLP, Dallas, TX, Dana Livingston, Wallace B. Jefferson, Alexander Dubose Jefferson & Townsend LLP, Austin, TX, for Petitioners.

Andrew T. Turner, Gavin S. Martinson Ogletree, Deakins, Nash, Smoak & Stewart, P.C., P. Michael Jung, Strasburger & Price LLP, Dallas, TX, for Respondents.

JUSTICE BOYD delivered the opinion of the Court.

In this contract dispute between the seller and buyer of a business, the buyer contends that one of its payment obligations is an unenforceable "agreement to agree." We conclude that the payment provision is enforceable because its material terms are sufficiently definite to enable a court to determine the buyer's obligation and provide a remedy for its breach. We reverse the court of appeals' judgment and reinstate the trial court's judgment.

## I.

### Background

Ray Fischer owned a tax-consulting business called Corporate Tax Management, Inc. As Fischer approached retirement, he began negotiations to sell the business assets to Mark Boozer and Jerrod Raymond. In 2007, the parties executed a written asset-purchase agreement in which Fischer agreed to sell his business to CTMI, L.L.C., which Boozer and Raymond created to receive the assets and operate the business. In a separate written employment agreement, the parties agreed that Fischer would remain as a CTMI employee until the end of 2010.

### A. The Asset–Purchase Agreement

The asset-purchase agreement specifically identified the assets that CTMI would acquire, including equipment, licenses, trade names, client agreements, and accounts receivable on projects that Fischer had not completed by the closing date. The agreement expressly excluded accounts receivable on any project Fischer completed before the closing, and required CTMI to pay Fischer 100% of any post-closing payments on those completed accounts to Fischer. For the projects Fischer had started but not completed before

the closing, the parties agreed that Fischer would be entitled to a percentage of any post-closing payments equal to the percentage by which Fischer had completed the project before closing. For example, if Fischer completed 75% of a project by closing, he would receive 75% of all post-closing payments on that account and CTMI would keep the remaining 25%. To effectuate this division of the 2007 accounts receivable, the agreement included an exhibit that listed each of the then-existing client projects and stated the percentage of each project that Fischer completed before the closing date.

In exchange for the business assets, CTMI agreed to pay a total "purchase price of ... $900,000." But the purchase agreement then provided that the purchase price would "be calculated and paid" as a series of payments that were not expressly tied to the $900,000 amount. Specifically, CTMI agreed to pay Fischer $300,000 at the 2007 closing, followed by a series of four annual "earn-out payments," one for each of the years in which Fischer would remain as a CTMI employee. For 2007, the earn-out payment was a single payment of $16,215, due in March 2008. For 2008 and 2009, the earn-out payments each consisted of two components: (1) a "minimum" payment of $194,595, due in March of the following year, plus (2) an "adjustment" payment equal to 30% of that year's business revenue in excess of $2.5 million, due in July of the following year. For 2010, the final earn-out payment included the same minimum payment and adjustment, but the 2010 adjustment included an additional component based on revenue that CTMI would receive after 2010 for work performed in 2010 on projects that were not completed by the end of 2010. This additional component of the 2010 adjustment is at issue in this appeal.

## B. Calculation of the 2010 Adjustment

As mentioned, the "adjustment" payment component of the 2008, 2009, and 2010 earn-out payments would depend on the amount of CTMI's "business revenue" for that year. The purchase agreement defined "business revenue" as "the gross revenue of the Business, as calculated on an accrual/calendar year basis (as mutually agreed to by [Fischer] and [CTMI])." Although the record and briefs are not entirely clear, it appears that the parties intended that "business revenue" from a project would "accrue" in the year that CTMI completed the project. See, e.g., 26 C.F.R. § 1.446–1(c)(1)(ii) ("Generally, under an accrual method, income is to be included in the taxable year when all the events have occurred that fix the right to receive the income and the amount of the income can be determined with reasonable accuracy."). But the agreement provided that the revenue from each project would include all amounts "collect[ed] through June 30th of the following year for services performed during the [preceding] calendar year." Thus, for example, if CTMI provided services for a client in 2008 but did not complete that project until 2009, the revenue from that project would "accrue" or be "earned" in 2009 and would include all amounts collected on that project prior to June 30, 2010.

Under these terms, the annual earn-out payments entitled Fischer to a share of the revenue from all projects that CTMI completed prior to the anticipated end of Fischer's employment on December 31, 2010. But in addition, the unique component of the 2010 adjustment at issue in this appeal entitled Fischer to share revenue from projects pending but not yet completed by the end of 2010. Specifically, regarding the 2010 earn-out payment, the parties agreed:

D. *2010 Earn Out Payment.* On or before March 15, 2011, [CTMI] shall pay to [Fischer] $194,595.00 (the "Minimum 2010 Payment"), plus on or before July 15, 2011, an amount equal to thirty percent (30%) of the Business Revenue exceeding $2,500,000.00 earned from January 1, 2010 through December 31, 2010 (the "2010 Adjustment"), which amount in total shall be considered the Earn–Out Payment for 2010. **By January 31, 2011, a list of projects that were in-progress as of December 31, 2010, will be generated with a percentage of completion assigned to each project as of December 31, 2010. The percentage of completion will have to be mutually agreed upon by [CTMI] and [Fischer]. The 2010 Adjustment will include revenue based upon the percentages assigned to these in-progress projects, but the portion of the 2010 Adjustment reflecting the in-progress projects will not be payable to [Fischer] until the respective revenue is actually collected....**

(Emphasis added.)

The first sentence of this provision, like the 2008 and 2009 earn-out provisions, required CTMI to make (1) a "minimum payment" of $194,595, due in March 2011, plus (2) an "adjustment" payment due in July 2011, equal to 30% of the amount by which the 2010 business revenue exceeded $2.5 million (the 2010 revenue payment). But unlike the 2008 and 2009 earn-out provisions, the remainder of this paragraph (the pending-projects clause) provided that, in addition to the 2010 revenue payment, the 2010 adjustment would include additional payments as CTMI collected revenue on projects that were pending but not completed at the end of 2010 (the pending-projects payments). Similar

to the method the parties used to allocate accounts receivable on the closing date in 2007, the parties agreed to base the pending-projects payments on the percentage of each project completed as of the end of 2010. For example, if in 2011 CTMI completed a project that was 50% completed at the end of 2010 and received a payment of $10,000 for that project, $5,000 would count towards Fischer's adjustment payment. Unlike the 2007 projects, however, the parties could not know when they contracted in 2007 which projects would be pending or what percentages of those projects would be completed at the end of 2010. The pending-projects clause thus provided that, by January 31, 2011, a list of projects pending at the end of 2010 "will be generated with a percentage of completion assigned to each project." The following provision—"[t]he percentage of completion will have to be mutually agreed upon"—is the basis of this dispute.

## C. Factual and Procedural History

At the 2007 closing, Fischer transferred his business assets to CTMI and CTMI paid Fischer $300,000, in accordance with the purchase agreement. In March 2008, CTMI made the 2007 earn-out payment, but disputes soon arose and CTMI refused to make any further payments. Initially, the disputes only involved the 2007 accounts-receivable payments and the adequacy of Fischer's performance under the employment agreement. In December 2008, CTMI sued Fischer[1] seeking a declaratory judgment that (1) Fischer had no right to payments on certain 2007 accounts receivable, and (2) CTMI had no obligation to make the remaining earn-out payments because Fischer had breached his employment contract. The following month, Fischer filed counterclaims alleging that

---

1. CTMI also sued Fischer's pre-sale tax consulting business, Certified Tax Management, Inc. We will refer to Fischer and Certified Tax Management, Inc. collectively as "Fischer."

CTMI had breached the purchase agreement by failing to pay him on the disputed accounts receivable and had breached the employment agreement by wrongfully terminating him.[2]

About a year later, in January 2010, CTMI filed a second amended original petition in which it alleged for the first time that portions of the asset-purchase agreement were unenforceable "agreements to agree." Specifically, CTMI asserted that none of the remaining earn-out payment obligations were enforceable because the calculation of the amounts depended on the amount of annual "business revenue," which the agreement defined as revenue "calculated on an accrual/calendar year basis (*as mutually agreed to by [Fischer] and [CTMI]*)." (Emphasis added.) In addition, CTMI asserted that the 2010 adjustment was also unenforceable because it provided that the pending projects' completion percentages at the end of 2010 "will have to be mutually agreed upon."

When the case went to trial in April 2011, the parties settled and agreed to a judgment awarding Fischer $1.7 million. The settlement, however, specifically excluded CTMI's challenge to the 2010 adjustment, and the parties agreed to sever CTMI's declaratory-judgment request on that single provision so that it could proceed to trial.[3] But the parties agreed that if Fischer prevailed on the severed cause

(i.e., if the courts ultimately rejected CTMI's contention that the 2010 adjustment was an unenforceable agreement to agree), CTMI would pay Fischer 15% of gross revenue from certain specified projects, and CTMI agreed to place those funds in escrow pending this case's resolution. In June 2011, the trial court entered judgment in the severed cause, declaring that the 2010 adjustment was not an unenforceable agreement to agree. CTMI appealed, and the court of appeals reversed and rendered judgment that "the 2010 Adjustment was ... an unenforceable agreement to agree." 479 S.W.3d 279, 283, No. 05–11–00970–CV, 2013 WL 4478106, at *3. We granted Fischer's petition for review.

## II.

## Enforceability of the Pending–Projects Clause

 In light of the parties' settlement and severance of all other claims, the only issue before us is whether the 2010 pending-projects clause created a legally enforceable obligation.[4] This unique procedural status complicates our analysis, because a finding that the pending-projects clause is unenforceable could render the entire asset-purchase agreement unenforceable, yet the parties have agreed through their settlement and in their briefing that the remainder of the pur-

---

2. Fischer also filed third-party claims against Boozer and Raymond for breach of contract and fraud. We will refer to Boozer, Raymond, and CTMI collectively as "CTMI."

3. The agreed severance order described the severed claim as CTMI's "request for declaratory relief to find the '2010 Adjustment' referenced in paragraph 2(c)(iv)(D) of the Parties' Asset Purchase Agreement as an unenforceable 'agreement to agree.' "

4. The claim for declaratory relief that the trial court severed after settlement related only to

the 2010 adjustment and did not challenge the enforceability of the 2010 minimum payment. And although the court of appeals held that "the 2010 adjustment" was unenforceable, CTMI has limited its arguments in this Court to the enforceability of the pending-projects clause, which CTMI identifies as the "sole issue on appeal." Because CTMI does not argue that the 2010 revenue payment is an unenforceable obligation, we will presume that obligation is enforceable and examine only whether the pending-projects clause is also enforceable.

chase agreement is enforceable. In light of the parties' settlement and severance agreement, we focus our analysis on the language of the pending-projects clause, as construed within the context of the contract as a whole. We conclude that the clause is sufficiently definite to be enforceable despite the parties' "agreement to agree" on completion percentages.

## A. Enforceability Standards

■ The court of appeals held that the 2010 adjustment is "an unenforceable agreement to agree" and thus "fails for 'indefiniteness' as a matter of law." 2013 WL 4478106, at *3. To be enforceable, a contract must address all of its essential and material terms with "a reasonable degree of certainty and definiteness." *Pace Corp. v. Jackson*, 155 Tex. 179, 284 S.W.2d 340, 345 (1955). Although it is difficult to say "just what particularity or refinement of terms is essential to meet the requirement of 'reasonable degree of certainty,'" *id.* a contract must at least be sufficiently definite to confirm that both parties actually intended to be contractually bound. *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex.2000). And even when that intent is clear, the agreement's terms must also be sufficiently definite to "enable a court to understand the parties' obligations," *id.*[5] and to give "an appropriate remedy" if they are breached, RESTATEMENT (SECOND) OF CONTRACTS § 33(2) (1981).

■ However, a contract need only be definite and certain as to those terms that are "material and essential" to the parties' agreement. *Radford v. McNeny*, 129 Tex. 568, 104 S.W.2d 472, 475 (1937); *see also*

*T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex.1992) ("The material terms of the contract must be agreed upon before a court can enforce the contract."). Other courts have held that, under Texas law, material and essential terms are those that parties would reasonably regard as "vitally important ingredient[s]" of their bargain. See *Neeley v. Bankers Tr. Co.*, 757 F.2d 621, 628 (5th Cir.1985); see also *Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 744 (Tex.App.–Houston [1st Dist.] 2014, no pet.); *Potcinske v. McDonald Prop. Invs., Ltd.*, 245 S.W.3d 526, 531 (Tex.App.–Houston [1st Dist.] 2007, no pet.). We agree, but we note that "[t]he material terms of a contract are determined on a case-by-case basis," *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex.2013), and "[e]ach contract should be considered separately to determine its material terms." *T.O. Stanley*, 847 S.W.2d at 221.

## B. Agreements to Agree

■ "It is well settled law that when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree." *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 846. If an agreement to make a future agreement is not sufficiently definite as to all of the future agreement's essential and material terms, the agreement to agree "is nugatory." *Radford*, 104 S.W.2d at 474–75. Thus, to be enforceable, an agreement to agree, like any other contract, "must specify all its material and essential terms, and leave none to be agreed upon as the result of future negotiations." *Id.* at 475.

5. *See also T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex.1992) ("In order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook."); *Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex.1966) ("[T]o be enforceable, a contract must be sufficiently certain to enable the court to determine the legal obligations of the parties thereto.").

Conversely, "[a]greements to enter into future contracts are enforceable if they contain all material terms." *McCalla*, 416 S.W.3d at 418. When an "agreement to enter into a future contract already contains all the material terms of the future contract," courts can determine and enforce the parties' obligations, and concerns about indefiniteness and reasonable certainty do not arise. *Id.* So an agreement that contains all of its essential terms is not unenforceable merely because the parties anticipate some future agreement. *See McCalla*, 416 S.W.3d at 418 (holding that even if settlement agreement in which party promised that he "will agree" and "agree[s] to enter an agreement" constituted "agreement to agree," it

was nevertheless enforceable because it contained all material terms).[6] In this case, we must determine whether the pending-projects clause, which states that "[t]he percentage of completion will have to be mutually agreed upon," is sufficiently definite as to all of its essential and material terms.[7]

## C. The Pending–Projects Clause

CTMI contends, and the court of appeals agreed, that because the pending-projects clause required the parties to "mutually agree" on the completion percentages to be assigned to projects pending at the end of 2010, the parties had only an "agreement to agree" with respect to the pending-projects payments. Relying

---

6. Although an agreement to agree that does not sufficiently describe its material terms is unenforceable, the parties may reach other related agreements that are sufficiently definite and enforceable. As we explained more than forty years ago:

> Two persons may fully agree upon the terms of a contract, knowing that there are other matters on which they have not agreed and on which they expect further negotiation. Such an expectation does not prevent the agreement already made from being an enforceable agreement. This may be true even though they expressly provide in their agreement that the new matters, when agreed upon shall be incorporated into a written lease or other formal document along with the contract already made. *Scott v. Ingle Bros. Pac.*, 489 S.W.2d 554, 556 (Tex.1972) (quoting Arthur Corbin, 1 Corbin on Contracts § 29 (1963)).

7. Fischer devotes much of his briefing to the argument that the pending-projects clause is necessarily enforceable because it is essential and material to the asset-purchase agreement and the parties indisputably intended to be presently and immediately bound to the purchase agreement when they signed it in 2007. *See McCalla*, 416 S.W.3d at 418 (distinguishing between "a presently binding contract or merely an agreement to agree"); *Foreca, S.A. v. GRD Dev. Co.*, 758 S.W.2d 744, 746 (Tex. 1988) (referring to an "immediate intent to be

bound"). Although CTMI does not dispute that the parties intended to be presently bound to the asset-purchase agreement, the issue of whether the pending-projects clause was material or essential to the purchase agreement is relevant to the enforceability of the asset-purchase agreement, not the pending-projects clause. *See, e.g., Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 846 ("It is well settled law that when an agreement leaves *material matters* open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree." (emphasis added)); *T.O. Stanley*, 847 S.W.2d at 221 ("Where an *essential term* is open for future negotiation, there is no binding contract." (emphasis added)). So although Fischer correctly contends that a party generally cannot "carve an essential term out of [an] otherwise enforceable contract to unilaterally grant itself a discount on the purchase price," the parties' settlement and agreed severance in this case prevent us from considering the enforceability of the asset-purchase agreement or whether the pending-projects clause was essential and material to that agreement. Instead, under the unique procedural status of this case, we must determine the enforceability of the pending-projects provision, and we do that by determining whether it describes all of its essential terms with sufficient definiteness or whether it is merely an unenforceable agreement to agree.

on several well-established principles to guide our analysis, we find that the pending-projects clause is sufficiently definite to enable a court to determine the parties' obligations and to provide a legal remedy, and we thus conclude that the clause is enforceable.

### 1. Guiding Principles

Several principles guide our analysis. First, it is fundamental that "we may neither rewrite the parties' contract nor add to its language." *Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 162 (Tex.2003); *see also Dahlberg v. Holden,* 150 Tex. 179, 238 S.W.2d 699, 701 (1951) (stating that courts "have no right to interpolate or to eliminate terms of material legal consequence in order to uphold" a contract) (quoting 13 C.J. *Contracts* § 496 (1917)). Nor may we "consider only the parts favoring one party and disregard the remainder." *City of Keller v. Wilson,* 168 S.W.3d 802, 811 (Tex.2005). Instead, we must construe the contract "as a whole," *id.* and "evaluate the overall agreement to determine what purposes the parties had in mind at the time they signed" it. *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.,* 320 S.W.3d 829, 841 (Tex.2010).

Second, because the law disfavors forfeitures, we will find terms to be sufficiently definite whenever the language is reasonably susceptible to that interpretation. "[I]t is a rule universally recognized that if an instrument admits of two constructions, one of which would make it valid and the other invalid, the former must prevail." *Dahlberg,* 238 S.W.2d at 701. "Forfeitures are not favored in Texas, and contracts are construed to avoid them." *Aquaplex, Inc. v. Rancho La Valencia, Inc.,* 297 S.W.3d 768, 774 (Tex. 2009); *see also Kirby Lake,* 320 S.W.3d at 842 (citing *REO Indus., Inc. v. Nat. Gas Pipeline Co. of Am.,* 932 F.2d 447, 454 (5th Cir.1991), for the proposition that "Texas

courts will not construe a contract to result in a forfeiture unless it cannot be construed in any other way"). Thus, if the parties clearly intended to agree and a "reasonably certain basis for granting a remedy" exists, we will find the contract terms definite enough to provide that remedy. *See* RESTATEMENT (SECOND) OF CONTRACTS § 33 cmt. b. When "the actions of the parties ... show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon[,] ... courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain." *Id.* cmt. a.

Third, when construing an agreement to avoid forfeiture, we may imply terms that can reasonably be implied. "Expressions that at first appear incomplete or uncertain are often readily made clear and plain by the aid of common usage and reasonable implications of fact." *Bendalin v. Delgado,* 406 S.W.2d 897, 900 (Tex.1966) (quoting RESTATEMENT OF THE LAW OF CONTRACTS § 370 & cmt. c). For example, courts often imply a term setting a reasonable "time of payment," *Radford,* 104 S.W.2d at 474, or a reasonable time during which the contract will remain effective, *Tanenbaum Textile Co. v. Sidran,* 423 S.W.2d 635, 637 (Tex.Civ.App.–Dallas 1967, writ ref'd n.r.e.) ("Where a contract is silent as to the time it is to run, or provides that it is to run for an indefinite term, ... the law will imply that a reasonable time is meant.").

Fourth, a term that "appears to be indefinite may be given precision by usage of trade or by course of dealing between the parties." RESTATEMENT (SECOND) OF CONTRACTS § 33 cmt. a. "Terms may be supplied by factual implication, and in recurring situations the law often supplies a term in the absence of agreement

to the contrary." *Id.* In *ATOFINA Petrochemicals, Inc. v. Continental Casualty Co.*, for example, we held that a provision that required a builder to "furnish . . . insurance" for the premises owner, but did not identify the type of insurance required or any of the coverage terms, was sufficiently definite because it was standard industry practice and consistent with the parties' past dealings to name the property owner as an additional insured on the builder's existing policy. 185 S.W.3d 440, 443 (Tex.2005). Thus, as a factual matter, the builder's existing policy provided the missing terms for the required insurance coverage and "the contract was sufficiently definite for the parties to understand their obligations." *Id.*

▇ Fifth, and finally, we are guided by the principle that "[p]art performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed." RESTATEMENT (SECOND) OF CONTRACTS § 34(2). And in fact, the parties' actions "in reliance on an agreement may make a contractual remedy appropriate even though uncertainty is not removed." *Id.* § 34(3). When the parties' actions demonstrate that they intended to "conclude a binding agreement, even though one or more terms . . . are left to be agreed upon . . ., courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain." *Id.* § 33(2) cmt. a. The law favors finding agreements sufficiently definite for enforcement, "particularly . . . where one of the parties has performed his part of the contract." *Tanenbaum Textile*, 423 S.W.2d at 637.

### 2. Enforceability of the Pending–Projects Clause

▇ Applying these principles, we conclude that the 2010 pending-projects clause is sufficiently definite to enable a court to determine CTMI's obligations and to pro-

vide a remedy for its breach, and is thus enforceable. We first note that the pending-projects clause affected the purchase price that CTMI agreed to pay for Fischer's business assets. "The failure of the parties to reach some understanding as to price often indicates that there has been no meeting of the minds," and "a contract which does not fix the price or consideration or provide an adequate way in which it can be fixed is too incomplete to be specifically enforceable." *Bendalin*, 406 S.W.2d at 899. But when the parties "have done everything else necessary to make a binding agreement . . ., their failure to specify the price does not leave the contract so incomplete that it cannot be enforced." *Id.* at 900. "In such a case it will be presumed that a reasonable price was intended." *Id.*

Based on the language of the pending-projects clause, as construed within the context of the asset-purchase agreement as a whole, we conclude that the parties confirmed their mutual intent to reach a binding agreement that CTMI would pay Fischer a share of revenues from the projects pending at the end of 2010. The purchase agreement, which CTMI agrees was enforceable, expressly provided that the total purchase price "will be paid," that as part of that payment CTMI "shall pay" the 2010 earn-out payment, including the 2010 adjustment, and that the 2010 adjustment *"will include"* revenue based on the projects pending at the end of 2010. (Emphasis added.) This language expressly describes CTMI's then-present and immediate intent to be bound to pay Fischer for the pending projects.

▇ As CTMI notes, the agreement does not specify the *amount* of the pending-projects payments. Of course, in 2007 the parties could not specify the amounts because they agreed to calculate those

amounts based on the completion percentages of pending projects at the end of 2010, and they could not know in 2007 which projects would be pending or their completion percentages more than three years later. When one input into a formula is unknowable at the time of contracting, however, the parties' inclusion of a description of the input to be supplied later can make the agreement sufficiently definite. As this Court has observed, when a "contract was about as definite and certain as the parties could have made it under the circumstances and it was sufficiently definite and certain to furnish a basis for arriving with reasonable certainty at the minimum damages," the contract is enforceable. *Pace*, 284 S.W.2d at 347.

■ This is not a case in which the parties failed to "reach some understanding as to price" or "provide an adequate way in which it can be fixed." *Bendalin*, 406 S.W.2d at 899. To the contrary, the agreement provided a clear formula or standard by which to determine the payments: the completion percentages of projects pending at the end of 2010. The law's presumption that the parties intended a reasonable price is particularly strong when the agreement specifies a formula or other basis on which a reasonable price may be determined. *See David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (holding that, although the parties did not specify an exact total price, their agreement to use hourly rates confirmed that they intended a reasonable price); *see also Penwell v. Barrett*, 724 S.W.2d 902, 905 (Tex.App.–San Antonio 1987, no writ) ("When an agreement provides a standard to be applied in determining price, the contract is sufficiently definite to be enforceable.").

We conclude that the 2010 pending-projects clause expressly obligated CTMI to pay Fischer for the value of the projects pending at the end of 2010, and to do so based on the completion percentages of each of those projects. As CTMI asserts, because the agreement did not list the pending projects and their completion percentages, a court cannot determine from the agreement's language the actual amount that CTMI owes. But because the pending-projects clause confirms CTMI's intent to be bound to its agreement to pay Fischer for the work completed on those projects, the law may presume "that a reasonable price was intended," *Bendalin*, 406 S.W.2d at 900, *even if* "the price is left to be agreed by the parties and they fail to agree." RESTATEMENT (SECOND) OF CONTRACTS § 33 cmt e.

The principle that the parties' dealings may give precision to language that otherwise appears indefinite supports the enforceability of the pending-projects clause. RESTATEMENT (SECOND) OF CONTRACTS § 33 cmt. a. When the parties entered into the purchase agreement, they engaged in exactly the same process with respect to the projects pending at the 2007 closing, apportioning accounts receivable between themselves based on the completion percentages of each project pending on that date. Thus, when the parties agreed to generate "a list of projects that were in-progress as of December 31, 2010 ... with a percentage of completion assigned to each project as of December 31, 2010," they knew exactly how the process would work because they had just done it with then-existing accounts. We read the 2010 pending-projects clause to require the parties to engage in the same process in January 2011 with respect to outstanding revenues from pending projects as they did in 2007 with respect to accounts receivable on incomplete projects.

In addition, the principle that the parties' performance "in reliance on an agreement may make a contractual remedy ap-

propriate even though uncertainty is not removed" also supports a conclusion that the pending-projects clause is enforceable. RESTATEMENT (SECOND) OF CONTRACTS § 34(3). Although it performed other obligations under the purchase agreement, CTMI argues that this principle is inapplicable because it never performed any obligation under the pending-projects clause. That may be true, but CTMI substantially performed its obligations under the purchase agreement, and Fischer fully performed by transferring his business assets to CTMI in exchange for a price that CTMI expressly agreed "will include" payments based on the projects pending at the end of 2010. When parties "have already rendered some substantial performance or have taken other material action in reliance upon their existing expressions of agreement," courts "will be more ready to find that the apparently incomplete agreement was in fact complete and required the payment and acceptance of a 'reasonable' price or a performance on 'reasonable' terms." *Scott*, 489 S.W.2d at 556 (quoting ARTHUR CORBIN, 1 CORBIN ON CONTRACTS § 29). "The fact that they have so acted is itself a circumstance bearing upon the question of completeness of their agreement." *Id.* (quoting ARTHUR CORBIN, 1 CORBIN ON CONTRACTS § 29).

We are left, then, with the fundamental principle that courts cannot rewrite the parties' contract or add to or subtract from its language. Relying on this principle, CTMI argues that a court cannot imply a reasonable price for the pending projects because the parties expressly agreed that the completion percentages "will have to be mutually agreed upon by [Fischer] and [CTMI]." In light of this language, CTMI asserts, it was only obligated to make the pending-projects payments "if the parties reached mutual agreement on completion percentages for in-progress projects." According to CTMI, a court "cannot force

parties to reach mutual agreement," and unless we delete or rewrite this language, a court cannot impose any price without "additional negotiation and agreement between the parties."

■ To be sure, contracting parties' "agreement to enter into negotiations, and agree upon the terms of a contract, if they can, cannot be made the basis of a cause of action." *Radford*, 104 S.W.2d at 474. The pending-projects clause, however, says nothing about any "additional negotiations" over the completion percentages. The parties' prior dealings with the 2007 accounts receivable indicates that the completion percentages represent simple calculations of the work performed on a particular project before a certain date and the work to be performed after that date until the project's completion. CTMI agreed that that the 2010 adjustment "will include revenue based upon" those percentages, and nothing in the pending-projects clause indicated that either party reserved the right to "negotiate" for a different price or a "better deal" than the one they agreed to in 2007.

Moreover, the pending-projects clause does not say that CTMI would have no obligation to make the pending-projects payments "if" the parties failed to agree on completion percentages; it simply says that those percentages "will have to be mutually agreed upon." Construing that language within the purchase agreement as a whole, we note that the agreement also includes a "Cooperation" provision in which the parties agreed that neither party would "voluntarily undertake any course of action inconsistent with satisfaction of the [agreement's] requirements," and "each shall promptly do all such acts and take all such reasonable measures as may be appropriate to enable it to perform as early as practicable the obligations herein

provided to be performed by it."[8] Contrary to CTMI's suggestion that it could simply avoid its agreement to pay for the 2010 pending projects by refusing to agree on completion percentages, the purchase agreement required CTMI to take "reasonable measures" to fulfill that obligation. And although the parties might reasonably disagree over the exact completion percentages, they expressly agreed that those percentages would determine the amounts of the pending-project payments, which CTMI expressly agreed the 2010 adjustment "will include."

For these reasons, we find that the cases on which CTMI relies are distinguishable in important respects. CTMI relies, for example, on *Playoff Corp. v. Blackwell,* in which the parties entered into an employment contract that promised the employee 25% of a portion of the company's fair market value upon his termination. 300 S.W.3d 451, 454 (Tex.2009). The parties did not agree, however, on how the company's fair market value would be determined, but instead agreed that it would be determined based on a specific "formula or methodology" that the parties would have to agree to in the future after "later negotiations." *Id.* at 456–57. The court concluded that the agreement in that case was unenforceable because the parties had agreed to agree on a method "to determine fair market value." *Id.* at 457. CTMI also relies on a Tennessee court of appeals' decision in *Four Eights, LLC v. Salem,* in which the court similarly held that the parties had redefined fair market value to be something that they had to agree on after further negotiations, and the agreement did not include any way to determine that value. 194 S.W.3d 484, 486 (Tenn.Ct.App.2005).

In contrast to the agreements in *Playoff* and *Four Eights,* the pending-projects clause at issue here contained a specific method or standard to determine the amount of the pending-projects payments: the completion percentages of those projects at the end of 2010. Once the parties executed the purchase agreement in 2007, they already agreed on the method or standard for determining the payments, and all that remained for them to agree upon were the completion percentages as of December 31, 2010.

We conclude that the language providing that the completion percentages "will have to be mutually agreed upon" is more akin to the language in the agreement we recently addressed in *McCalla,* 416 S.W.3d at 417. The parties in *McCalla* entered into a settlement agreement that provided that one party would sell property to the other party for a specific price. At the bottom of the typewritten agreement, the selling party handwrote additional clauses, including: "I will agree to $470,000 purchase price above" and "I agree to enter an agreement as discussed above." *Id.* We rejected the seller's argument that these references to future agreements rendered the settlement indefinite and unenforceable because, "[a]ssuming arguendo

---

8. CTMI argues that the cooperation clause is irrelevant to this severed case because the parties settled all other claims and the only issue before us is the enforceability of the pending-projects clause. CTMI asserts that if it were to unreasonably refuse to agree to completion percentages, Fischer's claim would be for breach of the cooperation clause, not the agreement to agree, and any claim for breach of the cooperation clause has been released through the parties' settlement.

We disagree, because we must construe and consider the pending-projects clause within the contract as a whole, which includes the cooperation clause. Even if the settlement agreement might prevent Fischer from suing for breach of the cooperation clause—an issue not presented here—the clause remains relevant to our determination of what CTMI intended when it entered into the purchase agreement containing the pending-projects clause.

that the settlement agreement was an agreement to enter into a future contract, . . the settlement agreement did contain all the material terms of the future contract." *Id.* at 418. Because a court "could find all the terms necessary for its enforcement[,] . . . the agreement contains all material terms and is an enforceable contract." *Id.*

In the same way, the language providing that the parties "will have to mutually agree" on completion percentages does not render the pending-projects clause unenforceable because the clause contains all of the terms necessary for a court to enforce it. CTMI expressly agreed to pay Fischer for the pending projects, and in light of the parties' prior conduct regarding the 2007 accounts receivable, the parties' substantial performance of their contractual obligations, and the law's preference to avoid forfeiture, we conclude that a court could determine CTMI's obligations and provide a remedy by implying a reasonable price based on objective facts and the specific standard to which the parties agreed, without rewriting the clause's language. We thus conclude that the pending-projects clause is sufficiently definite to be enforceable even though the parties agreed to agree on the completion percentages.

Finally, while we have held that a court could determine CTMI's obligation under the 2010 adjustment and provide a remedy for CTMI's breach of that obligation, we need not do so here. This severed action presents a claim for declaratory relief, not a claim for breach of contract, and the parties have already agreed on the amount CTMI must pay Fischer in light of our holding that the 2010 adjustment is not an unenforceable agreement to agree.

## III.

### Conclusion

We hold that the trial court did not err in denying CTMI's request for a declaratory judgment that the 2010 adjustment was an unenforceable agreement to agree and that the court of appeals erred in reversing the trial court's judgment. We therefore reverse the court of appeals' judgment and render judgment reinstating the trial court's denial of CTMI's claim for declaratory relief.