**Reversed and Rendered and Memorandum Opinion filed July 15, 2021.**



**In The**

# Fourteenth Court of Appeals

## NO. 14-19-00730-CV

### C3 COMMUNICATIONS, LLC, Appellant

### V.

### GIGABIT TECHNOLOGIES, LLC, Appellee

**On Appeal from the 55th District Court
Harris County, Texas
Trial Court Cause No. 2017-63042**

## M E M O R A N D U M   O P I N I O N

Appellee Gigabit Technologies, LLC ("Gigabit") sued appellant C3 Communications, LLC ("C3") for amounts allegedly owed pursuant to three agreements. After a bench trial, the trial court rendered judgment in favor of Gigabit and awarded it $62,139.73 in damages. For the reasons below, we reverse the trial court's final judgment and render judgment in Gigabit's favor in the amount of $31,474.57.

BACKGROUND

*Procedural History*

C3 entered into a subcontract with Gigabit to replace certain data cables at the Shriners Children's Texas hospital in Galveston. During the project, Gigabit sent C3 one "Budgetary Estimate" and two "Change Orders" delineating the work required to complete the project and the price for that work. After C3 failed to remit the total amount owed under the Budgetary Estimate and Change Orders, Gigabit sued C3 and asserted claims for breach of contract and fraud.[1] The parties proceeded to a bench trial in March 2019.

*Evidence at Trial*

Stephan Sanchez works in Gigabit's operations logistics department and was the first witness to testify at trial. Sanchez testified that Gigabit was contacted by Jonathan Ferrell, C3's owner and operator, with respect to the Shriners project. According to Sanchez, Shriners wanted to update their network's data system to newer technology.

Sanchez said he and Ferrell conducted a walk-through of the Shriners facility, during which the scope of the project was discussed. Afterwards, Sanchez said Gigabit sent C3 a Budgetary Estimate. The Budgetary Estimate was admitted into evidence; it is dated April 25, 2016, and includes a description of the work to be done as well as a price for each item. The total cost included in the Budgetary Estimate is $165,897.15. Discussing the Budgetary Estimate, Sanchez said Gigabit was "not allowed to exceed the scope of this job without an additional contractual agreement by and between [Gigabit] and C3."

---

[1] Gigabit also asserted claims against Fibernet Engineering, Inc., the company that hired C3 to complete the Shriners Hospital project. At trial, the trial court granted Fibernet's motion for directed verdict on Gigabit's claims. Gigabit did not appeal this ruling and Fibernet is not a party to this appeal.

According to Sanchez, Gigabit received a purchase order from C3 that included a description of the project and the project's total cost in response to the Budgetary Estimate. Sanchez testified that Gigabit began the Shriners project in October 2016. Admitted into evidence was a November 2016 check from C3 to Gigabit for $82,948.58 — approximately half of the price listed in the Budgetary Estimate.

Sanchez testified that, during the project, "some out-of-scope work" came up that was "outside of [Gigabit's] estimate." Specifically, Sanchez said the hospital received an influx of patients that delayed Gigabit's completion of its work. Sanchez said he discussed the delay with Ferrell as well as its changes to Gigabit's estimate of the project's total cost:

> Mr. Ferrell and I had a conversation saying there was additional time on the job; there was stuff that we cannot plan for, emergencies, so forth.
>
> [Ferrell] said, put it in a work order; send it over to me, the change order. And [Ferrell] would push it through to Mr. Farouk,[2] and we would just keep on going. [Ferrell] was like, don't stop. We've got to get the project completed.

Sanchez testified that a second incident arose that caused additional changes to the project's estimated cost. According to Sanchez, Gigabit had to remove extra cables from the Shriners hospital that were not included in the original estimate. Sanchez said he spoke with Ferrell about this additional work and Ferrell told him "write it down, keep going forward, we have to finish the project; and then [Ferrell] would proceed on his side and get back with [Gigabit] on that." According to Sanchez, Ferrell "wasn't happy" about the cost of the additional work but instructed Gigabit to proceed.

---

[2] Farouk Mohammed is the president of Fibernet Engineering, Inc., the company that contracted with C3 to complete the Shriners project.

Sanchez testified that Gigabit issued two Change Orders with respect to these additional charges. Both Change Orders were issued after the work was completed and are dated January 26, 2017. Change Order #1 lists $9,880.72 in charges and includes the following summary of the work performed:

> Down Time/Patch Cords/6th Floor Ladder Tray
>
> This Change Order is for all Downtime that was [sic] occurred on the job that wasn't expected or included on the bid.
>
> Waiting on Keys, Permission to enter restricted areas, Permits, Dock Access, Skin Rank, Patient's [sic] from Mexico.
>
> Tech Support, Fabricating Patch cords
>
> Elevators were shut down do [sic] to a fire across the street at UTMB. Their Patience [sic] were transferred to Shriners.

Change Order #2 lists $20,784.44 in charges and includes the following summary of the work performed:

> Demo extra Cables that where [sic] not included in the original scope of work.
>
> Demo all existing station cables that are in place from the floor to the IDF closet. Cables were not removed from the 110 Blocks.
>
> All work is performed after hours. And some work will be done with a containment Unit.

Both Change Orders include a line stating "Acceptance & Notice to Proceed" followed by a space labeled "Signature". Neither Change Order is signed.

Also admitted into evidence was a January 30, 2017 email exchange between Sanchez and Ferrell. In the first email, Sanchez sends Ferrell both Change Orders and states: "Change Order [#2] is for the Demo of the existing cables. Change order [#1] is for Down Time . . . (i.e. explosion in Mexico delaying our work progress .. plus), Patch Cords, 6th floor Ladder Tray and More." In response, Ferrell said:

4

You're telling me that Shriners will be expecting a change order for down time etc for almost $10K and be ok with that? And I sent you the pic of my original prints/notes where it showed the ladder in MDF was discussed and to be included. If you missed [the] 5th floor, that's not my issue. 6th floor, MDF floor, clearly states 2 sets of materials which acknowledges it was to be done. I think it was simply forgotten.

And your requested change order for the demo is almost unrealistic. In your proposal to me, it states Gigabit will demo all existing cabling. This is why Shriners does not find it to be a change order. I'm willing to help out, out of my own pocket, but $20K is unrealistic.

In response, Sanchez replied:

Sir the demo was never in G.T. estimate for the Phone side and you know that only the DATA .. You told me that it was between you and Farouk. That you didn't agree with him on the demo but you told me that you were going to have to pay for it out of your pocket . . . . Do you remember that conversation? You shouldn't be surprised with the amount of the change order. You told me on the phone that it was going to be a big change order. Yes Shriners should be expecting a change order.

Finally, Ferrell replied in part:

I'm not disagreeing with you that it wasn't very clear, but like I told you during our conversation, I see both sides. Unfortunately, Shriners goes by what's written in the proposals. Which yours and mine said demo of all existing cabling. Read it again. I'm willing to pay a reasonable amount to go back and demo because of the unclarity of the situation. It's simply out of the goodness of my heart. Brass tax, I don't have to. You[r] proposal says that. Now, if you want to rethink your change order amount, I'll honor my words and pay a reasonable amount out of my own pocket. There's no way I'm paying $20K.

During his testimony addressing the Change Orders, Sanchez was asked whether he could "provide any evidence . . . where, prior to you commencing with the change orders that were never executed, there were agreed-upon terms for both the scope and the pricing of these change orders?" In response, Sanchez said "no."

5

Sanchez also was asked, "what specific amount was agreed to as it relates to both of the change orders?" In response, Sanchez said: "There was not an agreement. We were still in the process of getting everything completed." Sanchez agreed that, at this stage, it was "[b]asically a negotiation."

According to Sanchez, the Shriners project was completed in February 2017. Gigabit received from C3 a second check on February 3, 2017, in the amount of $41,474.00.

In April 2017, Sanchez received an email from C3's attorney. In relevant part, the email states:

> I am writing to ensure that we have clear communication as to the outstanding invoice payable to Gigabit. Specifically Gigabit Invoice #2777 in the amount of $82,948.57 dated December 1, 2016. As I understand it, at this time, my client is not disputing the amount of the invoice. However, as you know, my client is still waiting on the owner, Shriners Hospital, to close out the job and complete payment. I believe that my client has paid half of the subject invoice in good faith even though it was not obligated to do so. As to the "change orders" mentioned in your subject email, they are out of market price, and, while my client has agreed to pay a "reasonable" amount, the amount submitted by you is rejected.

Ferrell also testified at the bench trial. According to Ferrell, he was not contacted with respect to the delays billed in Change Order #1 and "never authorized it." With respect to Change Order #2, Ferrell said he was aware of the scope of the work but there was "a debate" regarding whether that work was included in the original Budgetary Estimate. Ferrell testified that he "was trying to do a negotiation: Let's get it done, we will move forward, send me something realistic. And what I got was unrealistic, and that's when it got shut down."

After receiving the Change Orders, Ferrell said he told Gigabit that he was not willing to pay anything for Change Order #1 but would pay $5,000 for Change

Order #2. According to Ferrell, he had to return to the Shriners facility and finish some of Gigabit's work that was not completed. Ferrell estimated that his costs to complete this work totaled $14,000.

### *Final Judgment*

In its final judgment signed on August 26, 2019, the trial court made the following findings of fact:

1. In October 2016, Gigabit and C3 Communications entered into a written agreement for Gigabit to upgrade the network infrastructure of Shriner Hospital for Crippled Children.

2. The parties subsequently agreed to change orders.

3. Gigabit performed all of its obligations under the written agreement and the change orders.

4. C3 Communications failed to perform their obligations under the written agreement and change orders by failing to pay the remaining amounts owed to Gigabit.

The trial court found that Gigabit was entitled to $72,139.73 in damages: $41,474.57 for the amount owed under the Budgetary Estimate, $9,880.72 for the amount owed under Change Order #1, and $20,784.44 for the amount owed under Change Order #2. The trial court also found that C3 was entitled to a $10,000 offset.

The trial court's judgment awarded Gigabit $62,139.73 in damages on its breach of contract claim against C3. C3 filed a notice of appeal.

### ANALYSIS

On appeal, C3 argues that the Change Orders are not enforceable contracts because the evidence conclusively shows that (1) C3 did not accept either of the Change Orders, and (2) the parties did not reach a meeting of the minds on the essential terms of price and scope of work. In the alternative, C3 asserts the

7

evidence is legally and factually insufficient to support the trial court's finding that the parties agreed to the Change Orders. C3 does not challenge the trial court's findings and conclusions with respect to the obligations or amounts owed under the Budgetary Estimate.

Responding to C3's appellate brief, Gigabit raises a cross-point with respect to attorney's fees.

We begin with Gigabit's cross-point before turning to C3's issue on appeal.

## I.   Gigabit's Cross-Point

In its appellate response, Gigabit asserts the trial court erred by failing to "expressly grant[]" Gigabit attorney's fees in the final judgment. Gigabit did not file a notice of appeal in the trial court.

Under Texas Rule of Appellate Procedure 25.1, "[a] party who seeks to alter the trial court's judgment or other appealable order must file a notice of appeal." Tex. R. App. P. 25.1(c); *see also Frontier Logistics, L.P. v. Nat'l Prop. Holdings, L.P.*, 417 S.W.3d 656, 666 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ("an appellee in the court of appeals who has not filed a notice of appeal may not seek to alter the trial court's judgment in a way that would award the appellee more relief than the trial court granted the appellee in its judgment"). Pursuant to Rule 25.1, a party that seeks to amend the trial court's judgment to include an award of attorney's fees must file a notice of appeal. *See, e.g.*, *Locke v. Briarwood Vill.*, No. 14-17-00113-CV, 2018 WL 5621379, at *4 (Tex. App.—Houston [14th Dist.] Oct. 30, 2018, no pet.) (mem. op.); *N.Y. Party Shuttle, LLC v. Bilello*, 414 S.W.3d 206, 219 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

Here, because Gigabit did not file a notice of appeal, it waived its right to present a complaint for appellate review that the trial court failed to award attorney's fees. *See* Tex. R. App. P. 25.1; *see also Locke*, 2018 WL 5621379, at

8

\*4; *N.Y. Party Shuttle, LLC*, 414 S.W.3d at 219. We overrule Gigabit's "cross-point."[3]

## II. C3's Issue Regarding the Change Orders

### A. Standards of Review

Here, the arguments C3 raises on appeal do not address express findings made in the trial court's judgment; accordingly, we construe these issues as challenges to the trial court's implied findings. *See Harris Cty. v. Ramirez*, 581 S.W.3d 423, 427 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (when the trial court does not file findings of fact and conclusions of law after a bench trial, "we infer all findings necessary to support the judgment"). Implied findings are reviewable for evidentiary sufficiency under the same standards as applied to the review of a jury's findings. *Land v. Land*, 561 S.W.3d 624, 637 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).

To analyze the legal sufficiency of the evidence supporting a finding, we review the record in the light most favorable to the factual findings, crediting favorable evidence if a reasonable factfinder could do so and disregarding any contrary evidence unless a reasonable factfinder could not do so. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally sufficient if it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex.

---

[3] The term "cross-point" arose under the pre-1997 appellate rules when providing security for appellate costs perfected a civil appeal. *See* former 1986 Tex. R. App. P. 40(a); *Donwerth v. Preston II Chrysler-Dodge, Inc.*, 775 S.W.2d 634, 640-44 (Tex. 1989) (Ray, J., concurring and discussing perfection of appeal in intermediate appellate courts and the role of "cross-points," and suggesting a revision of appellate rules). The adoption of the current Texas Rules of Appellate Procedure in 1997 carried out the *Donwerth* concurrence's suggestion to adopt the procedure used to perfect appeals in the federal courts of appeals, which requires any party who seeks more or different relief from that afforded by the trial court's judgment to perfect its own appeal. *See Donwerth*, 775 S.W.2d at 644.

2004). If the evidence does no more than give rise to mere surmise or suspicion, then it is legally insufficient. *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011).

To evaluate the factual sufficiency of the evidence, we consider and weigh all of the evidence in a neutral light and set aside the challenged finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We may not pass upon the witnesses' credibility or substitute our judgment for that of the factfinder, even if the evidence would support a different result. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

We review a trial court's conclusions of law *de novo* to determine if the trial court drew the correct legal conclusions from the facts. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). If the trial court rendered the proper judgment, we will not reverse it even if the trial court's conclusions of law are incorrect. *Id*.

## B. Enforceable Contracts

In its final judgment, the trial court found that the parties "agreed to [the] change orders." Implied within this finding is the trial court's determination that the Change Orders satisfied the elements necessary to constitute legally enforceable contracts. *See Harris Cty.*, 581 S.W.3d at 427.

A legally enforceable contract consists of five elements: (1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Tauch v. Angel*, 580 S.W.3d 808, 813 (Tex. App.—Houston [14th Dist.] 2019, pet. granted); *Parker Drilling*

10

*Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 72 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

With respect to the Change Orders, C3 argues the evidence is insufficient to show acceptance in strict compliance with the terms of the offer and a meeting of the minds. Because we conclude insufficient evidence supports the implied finding that the parties had a meeting of the minds with respect to the Change Orders' essential terms, we need not address C3's other argument regarding acceptance.

### 1.   Meeting of the Minds

For an agreement to be enforceable, there must be a meeting of the minds with respect to its subject matter and essential terms. *Parker Drilling Co.*, 316 S.W.3d at 75. "Mutual assent concerning material, essential terms is a prerequisite to formation of a binding contract." *2002 Trinity Fund, LLC v. Carrizo Oil & Gas, Inc.*, 393 S.W.3d 442, 449 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

Whether the parties came to a meeting of the minds is based on the objective standard of what they said and did — the parties' subjective thoughts and beliefs do not control. *In re S.M.H.*, 523 S.W.3d 783, 795 (Tex. App.—Houston [14th Dist.] 2017, no pet.). For this determination, "[w]e view the conduct and circumstances surrounding the transaction from a reasonable person's interpretation at the time." *Yazdani-Beioky v. Sharifan*, 550 S.W.3d 808, 823 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). When, as here, a meeting of the minds is contested, a determination of the existence of a contract is a question of fact for the factfinder. *See In re S.M.H.*, 523 S.W.3d at 795.

But separate from the inquiry regarding an agreement's existence is whether that agreement is *legally enforceable*, which is a question of law. *See Yazdani-Beioky*, 550 S.W.3d at 823 ("Whether the parties reached an agreement is a

11

question of fact. Whether an agreement is legally enforceable is a question of law.") (internal citation omitted). "To be enforceable, a contract must address all of its essential and material terms with 'a reasonable degree of certainty and definiteness.'" *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (quoting *Pace Corp. v. Jackson*, 284 S.W.2d 340, 345 (Tex. 1955)). "[A] contract must at least be sufficiently definite to confirm that both parties actually intended to be contractually bound." *Id.* at 237. Even where the parties' intent to agree is clear, the agreement's terms must be sufficiently definite to permit the court to understand the parties' obligations and give an appropriate remedy for a breach. *Id.*; *see also Yazdani-Beioky*, 550 S.W.3d at 823.

An agreement must be definite and certain with respect to those terms that are "material and essential" to the parties' agreement. *Fischer*, 479 S.W.3d at 237. Material and essential terms are those that parties would reasonably regard as vitally important elements of their bargain and are determined on a case-by-case basis. *Yazdani-Beioky*, 550 S.W.3d at 823 (citing *Fischer*, 479 S.W.3d at 237).

When an agreement leaves essential or material terms open for future negotiation and those negotiations are unsuccessful, the agreement "is not binding upon the parties and merely constitutes an agreement to agree." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000); *see also Mabon Ltd. v. Afri-Carib Enters., Inc.*, 29 S.W.3d 291, 300 (Tex. App.—Houston [14th Dist.] 2000, no pet.). While Texas courts favor validating agreements rather than voiding them, a court may not create a contract where none exists and generally may not add, alter, or eliminate essential terms. *MKM Eng'rs, Inc. v. Guzder*, 476 S.W.3d 770, 778 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

Here, sufficient evidence supports the trial court's implied finding that the parties came to two oral agreements regarding the work later included in Change

Orders #1 and #2. Testifying with respect to this work, Sanchez said that he spoke to Ferrell before the work was undertaken and that Ferrell twice instructed him to proceed. Sanchez testified that the additional work was completed and later billed in Change Orders #1 and #2. Considered from a reasonable person's standpoint, this testimony regarding what the parties said and did is sufficient to show the existence of agreements preceding the work later billed in Change Orders #1 and #2. *See Yazdani-Beioky*, 550 S.W.3d at 823; *In re S.M.H.*, 523 S.W.3d at 795.

In contrast to Sanchez's testimony, Ferrell supplied a contrary version of events and testified that the parties did not reach any agreement regarding the Change Orders' work before that work was completed. According to Ferrell, he was not contacted in advance with respect to the delays billed in Change Order #1 and, with respect to Change Order #2, that the parties were still in the process of negotiating the price of that work. But this evidence only creates an issue of fact regarding whether the parties reached an agreement. *See In re S.M.H.*, 523 S.W.3d at 795 (when a meeting of the minds is contested, a determination of the existence of a contract is a question of fact for the factfinder). The trial court, as factfinder, resolved this question of fact in favor of Gigabit and impliedly found the existence of agreements later evidenced by Change Orders #1 and #2. The trial court was the sole judge of the witnesses' credibility and we decline to substitute our judgment for that of the trial court on this fact question. *See Mar. Overseas Corp.*, 971 S.W.2d at 407.

However, our inquiry does not end there; we also must consider whether these oral agreements are legally enforceable. *See Yazdani-Beioky*, 550 S.W.3d at 823 (whether an agreement is legally enforceable is a question is law). We conclude that, as a matter of law, the evidence is insufficient to show the parties' agreements are legally enforceable. Specifically, the evidence does not show that, when the parties reached these agreements, their assent addressed all material and

13

essential terms with "'a reasonable degree of certainty and definiteness" as necessary to render them enforceable. *See Fischer*, 479 S.W.3d at 237 (quoting *Pace Corp.*, 284 S.W.2d at 345).

Our analysis on this point begins with the oral agreement later evidenced by Change Order #1. As discussed above, Sanchez testified that Ferrell instructed him to proceed with the work billed in Change Order #1 before that work was undertaken:

> Mr. Ferrell and I had a conversation saying there was additional time on the job; there was stuff that we cannot plan for, emergencies, so forth.
>
> [Ferrell] said, put it in a work order; send it over to me, the change order. And [Ferrell] would push it through to Mr. Farouk, and we would just keep on going. [Ferrell] was like, don't stop. We've got to get the project completed.

Aside from Sanchez's testimony addressing the parties' oral agreement, the record does not contain any additional evidence showing what the parties agreed to with respect to the work later billed in Change Order #1.

Here, the scope of Gigabit's work and the price for that work were essential and material terms to the agreements between Gigabit and C3. *See, e.g.*, *Bill Wyly Dev., Inc. v. Smith*, No. 01-16-00296-CV, 2017 WL 3483225, at *4 (Tex. App.—Houston [1st Dist.] Aug. 15, 2017, no pet.) (mem. op.) (defining "material terms" as those contractual provisions "dealing with a significant issue such as subject matter, price, payment, quantity, quality, direction, or the work to be done") (internal quotation omitted); *Delcom Grp., LP v. Dallas Indep. Sch. Dist.*, No. 05-11-01259-CV, 2012 WL 3552672, at *4 (Tex. App.—Dallas Aug. 17, 2012, no pet.) (mem. op.) ("Although [the appellant] is correct that the letter of acceptance states a contract term, the record shows other essential material terms were lacking, including total price, number and type of classrooms to be completed, system

14

design, schedule for implementation, scope of work, and warranty."). These terms' essential nature is particularly evident in light of the fact that the parties already had agreed to the original scope of Gigabit's work on the Shriners project and the price as reflected in the Budgetary Estimate. Accordingly, any changes to these terms would have to be sufficiently definite to differentiate them from those to which the parties previously had agreed.

But Sanchez's testimony regarding the parties' oral agreement is too indefinite to establish those essential terms with a reasonable degree of certainty and definiteness. *See Fischer*, 479 S.W.3d at 237. Sanchez's testimony only states that he informed Ferrell of delays on the job and emergencies that necessitated additional costs. This testimony does not provide a reasonable delineation of the nature of the additional work or its cost as necessary to enforce the oral agreement. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("In order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook.").

This deficiency is even more pronounced when Sanchez's testimony is considered in conjunction with the work later billed in Change Order #1. Specifically, Sanchez testified that the parties agreed to a change order for "additional time on the job" and "stuff [Gigabit] cannot plan for" — but Change Order #1 includes charges for "Fabricating Patch Cords", a "6th Floor Ladder Tray", and "Tech Support", items that do not bear a direct relationship to Sanchez's description of the parties' oral agreement. Even considered in a light favorable to the trial court's implied findings, Sanchez's testimony fails to show that the parties reached an agreement regarding the scope and price of the additional work necessary to render the agreement enforceable.

We reach a similar conclusion with respect to the additional work later billed

15

in Change Order #2. Before undertaking this work, Sanchez testified that he spoke with Ferrell about the additional work and Ferrell told him to "write it down, keep going forward, we have to finish the project; and then [Ferrell] would proceed on his side and get back with [Gigabit] on that." This testimony does not evidence mutual assent concerning the agreement's material, essential terms. *See 2002 Trinity Fund, LLC*, 393 S.W.3d at 449.

Rather, according to Sanchez's testimony, Ferrell said he would "proceed on his side and get back with [Gigabit] on that." Sanchez's testimony comports with Ferrell's description of the agreement, in which he said there was an ongoing "debate" between the parties regarding whether this work was included in the original Budgetary Estimate. If anything, this evidence shows that the parties agreed to leave material terms open for future negotiation. But an "agreement to agree" is not binding upon the parties and does not establish the agreement's essential terms. *See Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 846; *Mabon Ltd.*, 29 S.W.3d at 300.

Other testimony at trial reinforces our conclusion that the parties did not reach definite agreements regarding the Change Orders' work before that work was completed. Specifically, Sanchez was asked whether he could "provide any evidence . . . where, prior to you commencing with the change orders that were never executed, there were agreed-upon terms for both the scope and the pricing of these change orders?" In response, Sanchez said "no." Sanchez also was asked, "what specific amount was agreed to as it relates to both of the change orders?" In response, Sanchez said: "There was not an agreement. We were still in the process of getting everything completed." As this testimony shows, the parties' oral agreements did not address all material and essential terms with a reasonable degree of certainty and definiteness as necessary to render those agreements enforceable.

Finally, the record does not show that C3 agreed to the Change Orders' terms at any other time. Sanchez emailed Change Orders #1 and #2 to Ferrell on January 30, 2017. Ferrell's response to the Change Orders does not evidence his assent — rather, Ferrell's emails show he disputed the charges in both Change Orders. Similarly, the April 2017 email to Sanchez from C3's attorney does not show that C3 assented to the charges in the Change Orders. Instead, C3's attorney stated that those amounts were "rejected."

We conclude the evidence does not show that the parties' oral agreements later evidenced by Change Orders #1 and #2 are legally enforceable. Specifically, the evidence pertaining to the agreements fails to show the parties' mutual assent to the agreements' material and essential terms as necessary to render them enforceable. *See Fischer*, 479 S.W.3d at 237. Therefore, we sustain C3's issue regarding the agreements' enforceability. We conclude the trial court erred by awarding Gigabit damages stemming from these oral agreements.

## CONCLUSION

Having sustained C3's sole issue on appeal, we reverse the trial court's final judgment and render judgment in Gigabit's favor in the amount of $31,474.57.


/s/     Meagan Hassan
        Justice


Panel consists of Justices Spain, Hassan, and Poissant.