**AFFIRM; Opinion Filed April 16, 2020**



In The
### Court of Appeals
### Fifth District of Texas at Dallas

_____

## No. 05-19-00192-CV

_____

## SHIVA SHIRVANI, Appellant/Cross-Appellee
## V.
## CELEBRITY HEALTHCARE MANAGEMENT, LLC, FREDERICK T. MONTESI III, FREDERICK T. MONTESI IV, JEFFREY B. PRESLEY, AND ANCONA HOLDINGS, LLC, Appellees

## AND

## HEALTHCARE HOLDINGS, LLC, Cross-Appellant

**On Appeal from the County Court at Law No. 5
Dallas County, Texas
Trial Court Cause No. CC-17-04895-E**

## MEMORANDUM OPINION

Before Justices Bridges, Whitehill, and Nowell
Opinion by Justice Nowell

Dr. Shiva Shirvani sued Healthcare Holdings, LLC along with Celebrity

Healthcare Management, LLC, Frederick T. Montesi III ("Fred"), Frederick T.

Montesi IV ("Eric"), Jeffrey B. Presley, and Ancona Holdings, LLC (collectively,

"appellees") for breach of contract.[1]  Following a bench trial, the trial court rendered

_____

[1] Shirvani also sued Healthcare Holdings and appellees for fraud and fraudulent inducement.  She did not prevail on those claims at trial and does not raise any appellate issues related to those claims.

judgment in favor of Shirvani and against Healthcare Holdings on the breach of contract claim and awarded actual damages of $1,200,000 to Shirvani. However, the trial court also ordered Shirvani take nothing on her claims against appellees.

In two issues on appeal, Shirvani asserts (1) there is no evidence, or, alternatively, factually insufficient evidence, to support the trial court's finding she failed to prove she had a binding contract with appellees, and (2) the trial court erred by concluding Shirvani was not entitled to recover attorney's fees from the individual appellees on her breach of contract claim. In its cross appeal, Healthcare Holdings argues Shirvani's breach of contract claim fails as a matter of law. We affirm the trial court's judgment.

FACTUAL BACKGROUND

Shiva Shirvani is a chiropractor. Through various entities, Shirvani and her then-husband, Ramin Siroosian,[2] owned a practice together. In April 2015, the entities owned by Shirvani and Siroosian transferred their interests in the practice to Healthcare Holdings in exchange for approximately $16 million.[3] The parties executed an asset transfer agreement ("Agreement"). As part of the Agreement, Shirvani and Siroosian agreed to a non-compete/non-solicitation provision; Shirvani testified at trial that if she complied with that provision, she would receive an additional payment in April 2020. The Agreement was signed by Siroosian as

---

[2] Siroosian is not a party to this litigation.
[3] Shirvani and Siroosian held their interests in the business in numerous entities, which were the transferring parties. The names of those entities are not relevant to this appeal.

–2–

president of the entities and as a principal, Shirvani as a principal, and Fred as president of Healthcare Holdings. None of the appellees individually signed the Agreement. After the Agreement was executed, Shirvani and Siroosian each owned an interest in Healthcare Holdings.

In October 2016, Siroosian, Healthcare Holdings, and appellees sued one another in Tennessee ("Tennessee Litigation"). Bob Craddock, a lawyer in Memphis, Tennessee, testified he represented Healthcare Holdings, Celebrity Healthcare Management, Fred, Eric, and Presley in the Tennessee Litigation. His clients "sued [Siroosian] for a $450,000 clawback . . and then, Dr. Siroosian counterclaimed on various things." Shirvani was not a party to the Tennessee Litigation.

Craddock testified that in June 2017, Carlos Cortez, a Texas lawyer, contacted him and advised that Shirvani would join the Tennessee Litigation "unless we would settle with him or buy her interests." After hearing from Cortez, Craddock communicated with Siroosian's lawyers about potentially settling the Tennessee Litigation. He was only interested in settlement if his clients could settle with Siroosian and Shirvani; Craddock's clients desired to remove Siroosian and Shirvani from the Healthcare Holdings and Celebrity Healthcare Management "so that those entities could be restructured and cash could be diffused, and it didn't do us any good to settle with one without the other."

Craddock verbally communicated with Siroosian's lawyers who responded with an email on June 21, 2017. The email states, in part, that Siroosian would be willing to accept a $1.2 million settlement provided some other conditions were satisfied, including Healthcare Holdings and appellees released Siroosian from future liability under the Agreement. On June 30, 2017, Siroosian's lawyers sent two emails to Craddock. One stated: "Subject to the negotiation of mutually agreeable agreement and compliance with applicable agreements and laws, our client has authorized us to proceed with the settlement process at 1.2 million." The second stated: "I should also add that we are not agreeing to our client getting less than Dr. Shirvani."

Craddock testified he told Cortez that "we would settle if we could settle with both parties. . . . I had communicated to Mr. Cortez that we would pay [$]1.2 million if we could work out the other terms." On Friday, June 30, 2017, Cortez emailed Craddock. The subject of the email is "Dr. Shiva Shirvani v. Celebrity Healthcare (CONFIDENTIAL SETTLEMENT PROPOSAL)." The body of the email states:

> Pursuant to our discussion this morning, we have agreed to sell 100% of Dr. Shirvani's interests in your client's company in exchange for $1.2 million dollars with the understanding that the covenant not to compete stays in place and that each side pays their own attorney's fees. In addition, there will be a "claw-back" provision whereby if Dr. Shirvani works as a chiropractor during the time period set out in the covenant not to compete[,] your client would be entitled to their monies back from Dr. Shirvani. This agreement is to mirror the exact terms offered to Dr. Siroosian, however, they are independent from one another and a violation from either of them would not affect the terms of the other.

–4–

Thank you for your professional courtesies in this matter and I look forward to receiving drafts of the Settlement Agreement/Buy-Out Agreement very soon.

On July 5, 2017, Craddock emailed Carlos Cortez and one of Siroosian's lawyers.

The subject of the email is "Healthcare Holdings/Settlement with Dr. Shivani [sic] and Dr. Siroosian." The body of the email states:

This will confirm that we have reached an agreement with both Dr. Shivani [sic] and Dr. Siroosian to settle on identical terms. My clients will purchase each of your clients' entire membership interest and obtain a complete release of all remaining monetary obligations to your client for an amount of $1.2 million to each individual. The non-competes will remain in full force; however, no additional funds will be paid to Dr. Siroosian or Dr. Shivani [sic] at the conclusion of the non-compete provision. The parties agree to a claw back provision in regard to the full amount paid in the event of violation of the non-compete. Violation of one person will not trigger claw back of funds paid to the other. We intend to work toward documenting this transaction in the next few days. We understand and consent in principal to documenting same as a sale of interest, both common and preferred, by both Dr. Shivani [sic] and Dr. Siroosian, with full release of liability with respect to all matters covered by the current litigation. This transaction is subject to suitable documentation.

Cortez responded to the July 5 email on the same day, stating:

Did you have a date certain in mind with respect to the payout? Secondly, there is no current litigation between my client (Dr. Shirvani) and your client so I'm not sure what we are releasing, however, it needs to be a mutual release.

On July 13, 2017, Siroosian's counsel sent an email to Craddock and Cortez, among others, (subject line "Healthcare Holdings/Settlement with Dr. Shivani [sic] and Dr. Siroosian") and attached a draft Settlement and Repurchase Agreement and

drafts of the Assignments of Membership Interests. The draft repurchase agreement states Healthcare Holdings would make a "Repurchase Payment" in the amount of $1.2 million to Shirvani and, separately, to Siroosian in exchange for each of their interests in Healthcare Holdings. The following day, Cortez replied stating: "We have a lot to discuss with the proposed Settlement Agreement. There are some major issues to talk about. Could you please advise what protocol we need to get the discussion started? (i.e. send red line revisions, phone call, etc.)." The resulting email correspondence indicates the lawyers discussed additional information on the phone.

On August 4, 201, Siroosian's counsel circulated (via email) a "draft of the Settlement and Repurchase Agreement and Release." The subject line of the email is: "Siroosian/Healthcare Holdings – Settlement Discussions." Replying to his own email the following day, the attorney stated "the biggest obstacle to settlement" was Siroosian's concern about a settlement binding him to all obligations and covenants under the Agreement. The lawyer stated he was "hoping that we can propose to our clients a more practical solution than saying that Dr. Siroosian needs to [be] bound by the entire [Agreement] or we need to go forward with the lawsuit." On August 31, 2017, an email chain was sent between lawyers with the subject line "Siroosian/Healthcare Holdings."

- Siroosian's lawyers to Craddock: "At this point in time we are requesting the bank pre-approval for the settlement in the amount of $1.2 Million."

- Craddock's partner to Siroosian's lawyer with a courtesy copy to Cortez: "We have talked to our clients and our offer under the terms agreed on Monday will be revoked effective noon tomorrow unless accepted in writing with no counter-proposal. We will not go back to the bank for final approval until we have Siroosian's signature."

- Carlos Cortez replying to the same group: "I have not received any final language from anybody although I have repeatedly requested that paperwork. We remain willing to comply with our Agreement. Please advise."

The draft documents were never signed by any party.

Shirvani sued Healthcare Holdings and appellees for breach of contract, asserting the parties' emails constituted an enforceable contract. Following a bench trial, the trial court entered findings of fact and conclusions of law, which included the following:

- The July 5, 2017 email is a valid and enforceable contract. In the alternative, the July 5, 2017 email and the June 30, 2017 email together constitute a valid and enforceable contract.
- Dr. Shirvani is a party under the express terms of the contract.
- The contract contained all the essential terms necessary to create a contract. And, as between Dr. Shirvani and Healthcare Holdings, there was a meeting of the minds.
- The contract expressly states that Mr. Craddock's "clients" are parties to the contract but is ambiguous as to which specific client is a party.
- On the date of the formation of the contract, the terms of the agreement were identical as to Dr. Shirvani and Dr. Siroosian. The court expresses no opinion as to whether after the contract was formed, Dr. Siroosian sought to sought to [sic] re-open negotiations

or alter the terms of the contract. Assuming that he did, such actions did not effect Dr. Shirvani's rights under the contract.

- [Shirvani] was due $1.2 million under the terms of the contract, and Healthcare Holdings failed to pay that amount. Healthcare Holdings, without excuse, breached the contract.

Using parole evidence, the trial court concluded Healthcare Holdings is a party to the contract, but Shirvani failed to prove any other appellee was a party to the contract.

LAW & ANALYSIS

## A. Standard of Review

In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *Wyde v. Francesconi*, 566 S.W.3d 890, 894 (Tex. App.—Dallas 2018, no pet.). When the appellate record contains a reporter's record, as it does in this case, findings of fact are not conclusive and are binding only if supported by the evidence. *Id.* We review a trial court's findings of fact under the same legal and factual sufficiency of the evidence standards used when determining if sufficient evidence exists to support an answer to a jury question. *Id.* When an appellant challenges the legal sufficiency of an adverse finding on which he did not have the burden of proof at trial, he must demonstrate there is no evidence to support the adverse finding. *Id.* However, when a party attacks the legal sufficiency of an adverse finding on an issue on which he had the burden of proof, he must demonstrate that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per

–8–

curiam). When reviewing the record, we determine whether any evidence supports the challenged finding. *Wyde*, 566 S.W.3d at 894. If more than a scintilla of evidence supports the finding, the legal sufficiency challenge fails. *Id*.

When an appellant challenges the factual sufficiency of the evidence on an issue, we consider all the evidence supporting and contradicting the finding. *Id*. We set aside the finding for factual insufficiency only if the finding is so contrary to the evidence as to be clearly wrong and manifestly unjust. *Id*. The trial court, as factfinder, is the sole judge of the credibility of the witnesses. *Id*. As long as the evidence falls "within the zone of reasonable disagreement," we will not substitute our judgment for that of the fact-finder. *Id*. (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)).

Because the trial court has no discretion in determining what the law is or applying the law to the facts, we review the trial court's conclusions of law de novo. *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). We will uphold the trial court's judgment if it can be sustained on any legal theory supported by the evidence. *BMC Software*, 83 S.W.3d at 794. If the trial court rendered the proper judgment, we will not reverse based on an erroneous conclusion of law. *Id*.

**B. Contract Between Healthcare Holdings and Shirvani**

### 1. Existence of a Contract

In its cross-appeal, Healthcare Holdings asserts the trial court erred in finding that it had a valid and enforceable contract with Shirvani because no enforceable contract existed as a matter of law. Rather, the sole alleged basis of any purported agreement—the July 5 email alone or together with the June 30 email—makes clear the parties did not reach a final agreement. Instead, Healthcare Holdings argues, the language of the emails establishes the parties contemplated future negotiations regarding the terms of their agreement and several material terms were never included in the email communications. Without the material terms, no binding contract could be formed.

The existence of a valid contract is one of the essential elements of a breach of contract claim. *Healey v. Romero*, No. 05-16-00598-CV, 2018 WL 2126903, at *2 (Tex. App.—Dallas May 7, 2018, no pet.) (mem. op.) (citing *Kay v. N. Tex. Rod & Custom*, 109 S.W.3d 924, 927 (Tex. App.—Dallas 2003, no pet.) (setting out elements of breach of contract claim)). Parties form a binding contract when the following elements are present: (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Id.* (citing *Levetz v. Sutton*, 404 S.W.3d 798, 803 (Tex. App.—Dallas 2013, pet. denied)).

To be enforceable, a contract must address all of its essential and material terms with "a reasonable degree of certainty and definiteness." *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (quoting *Pace Corp. v. Jackson*, 284 S.W.2d 340, 345 (Tex. 1955)). Although it is difficult to say "just what particularity or refinement of terms is essential to meet the requirement of 'reasonable degree of certainty," a contract must at least be sufficiently definite to confirm that both parties actually intended to be contractually bound. *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000); *Fischer*, 479 S.W.3d at 237. "And even when that intent is clear, the agreement's terms must also be sufficiently definite to 'enable a court to understand the parties' obligations,' and to give 'an appropriate remedy' if they are breached." *Fischer*, 479 S.W.3d at 237 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 33(2) (1981) (internal citation omitted).

A contract need only be definite and certain as to those terms that are "material and essential" to the parties' agreement. *Id.* (citing *Radford v. McNeny*, 129 Tex. 568, 104 S.W.2d 472, 475 (1937), and *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex.1992) ("The material terms of the contract must be agreed upon before a court can enforce the contract.")). Material and essential terms are those the parties would regard as vitally important ingredients of their bargain. *Id.* The material terms of a contract are determined on a case-by-case basis, and each contract should be considered separately to determine its material terms. *Id.*

"Agreements to enter into future contracts are enforceable if they contain all material terms." *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013) (per curiam) (citing *Fort Worth Ind. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex.2000); *Radford v. McNeny*, 129 Tex. 568, 104 S.W.2d 472, 474–75 (1937)). "After all, the reason agreements to enter into future contracts are often unenforceable is that courts have no way to determine what terms would have been agreed to after negotiation. This concern is not present when the agreement to enter into a future contract already contains all the material terms of the future contract." *Id.* (internal citation omitted); *see Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 482 (Tex. 2019).

"Whether the parties formed a contract is generally a fact question, although it may be determined as a matter of law." *Healey*, 2018 WL 2126903, at \*2 (citing *WTG Gas Processing, L.P. v. ConocoPhillips Co.*, 309 S.W.3d 635, 643 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *Foreca, S.A. v. GRD Dev. Co.*, 758 S.W.2d 744, 746 (Tex. 1988) (whether parties intended to enter into binding agreement is often question of fact)).

The trial court found the July 5 email was a valid and enforceable contract. Healthcare Holdings argues the email cannot be an enforceable contract because it shows the parties contemplated a future, final agreement memorializing the parties' agreement and obligations. We agree the July 5 email contemplates a future memorialization of the parties' agreement. However, the intention to execute future

–12–

documentation does not preclude the email from being an enforceable contract. Rather, the question is whether the July 5 email shows an intent to be bound and contains all material terms. *See McCalla*, 416 S.W.3d at 418. The email does both.

The first line of the email is a definitive statement that the parties reached an agreement. Craddock wrote: "This will confirm that we have reached an agreement with both Dr. Shivani and Dr. Siroosian to settle on identical terms." He then proceeds to state what the terms of that agreement are. He lists the specific assets to be sold, the price Healthcare Holdings agreed to pay for the assets, how the parties will treat the non-compete and claw-back provisions, and the liabilities being released. Considering the parties' conduct and words objectively, based on a reasonable person's interpretation, the July 5 email shows Healthcare Holdings and Shirvani had a meeting of the minds about the essential terms of their contract. *See Foreca, S.A.*, 758 S.W.2d at 746. The parties did not express, and their interactions do not otherwise conclusively convey, that either party regarded their agreement as conditional or not binding until reduced to a final writing. *See Chalker Energy Partners III, LLC v. Le Norman Operating LLC*, No. 18-0352, 2020 WL 976930, at *5 (Tex. Feb. 28, 2020) (parties "agreed a definitive agreement was a condition precedent to contract formation."). There is no expression of either party's lack of intent to bear any contractual obligation absent execution of a final written agreement; rather, the email confirms the parties did reach an agreement.

–13–

Healthcare Holdings argues the July 5 email does not explain the scope or content of the release of liability, which renders the contract unenforceable. We disagree. The July 5 email states Healthcare Holding will "obtain a complete release of all remaining monetary obligations to [Shirvani and Siroosian] for an amount of $1.2 million to each individual" and they agreed to a "full release of liability with respect to all matters covered by the current litigation." The email provides the liabilities being released in sufficiently definite terms to enable a court to determine each party's respective obligations and to provide a remedy for its breach. *See Fischer*, 479 S.W.3d at 240.

### 2. *Statute of Frauds*

Healthcare Holdings also argues Shirvani's claim for breach of contract is barred by the statute of frauds because the "alleged contract made the basis of [Shirvani's] lawsuit contains a non-competition provision with a term through 2020," which means it must comply with the provisions of the statute of frauds. Healthcare Holdings argues the statute of frauds requires the written memorandum to contain all elements of a valid contract including the identification of the parties to the contract, but the July 5 email does not do not identify the parties to the contract and that information may be not supplied by parole evidence.

An agreement which is not performed within one year from the date of the making is not enforceable unless it is in writing and signed by the person to be charged with the agreement or by someone lawfully authorized to sign for him. TEX.

–14–

BUS. & C. CODE §§ 26.01(a), 26.01(b)(6). This requirement is commonly called the statute of frauds. *Copano Energy, LLC v. Bujnoch*, No. 18-0044, 2020 WL 499765, at *4 (Tex. Jan. 31, 2020). Whether a contract comes within the statute of frauds is a question of law, which we review de novo. *Dynegy, Inc. v. Yates*, 422 S.W.3d 638, 642 (Tex. 2013).

Even if we assume the contract could not be completed within one year because of the non-competition provision as Healthcare Holdings argues, we conclude the agreement satisfies the statute of frauds. The subject line of the July 5 email[4] is: "Healthcare Holdings/Settlement with Dr. Shivani [sic] and Dr. Siroosian." The email, sent by Craddock who represented Healthcare Holdings, states in part: "This will confirm that we have reached an agreement with both Dr. Shivani [sic] and Dr. Siroosian to settle on identical terms. My clients will purchase each of your clients' entire membership interest and obtain a complete release of all remaining monetary obligations to your client for an amount of $1.2 million to each individual." The email specifically identifies Shirvani and Healthcare Holdings, the party to be charged, by name and is signed by a person lawfully authorized to sign for Healthcare Holdings, Craddock, the entity's attorney.[5] We conclude that if the

---

[4] Healthcare Holdings does not argue an email is not a writing sufficient to satisfy the statute of frauds. For purposes of this argument, we assume that it is.

[5] Craddock's signature block appears at the bottom of the email. Healthcare Holdings does not argue the July 5 email was not "signed." We express no opinion on that issue, but assume for argument's sake the signature requirement was satisfied because Healthcare Holdings does not contend otherwise. *See Bujnoch*, 2020 WL 499765, at *5, n.6.

–15–

agreement falls within the statute of frauds because it cannot be completed within one year, then the email satisfies the requirements of the statute of frauds.

We overrule Healthcare Holding's sole issue in its cross-appeal.

## C. Contract with Appellees

In two issues on appeal, Shirvani asserts (1) there is no evidence, or, alternatively, factually insufficient evidence, to support the trial court's finding she failed to prove she had a binding contract with appellees, and (2) the trial court erred by concluding Shirvani was not entitled to recover attorney's fees from the individual appellees. Shirvani can only prevail on her second issue if we sustain her first issue.

In support of her argument that the evidence is insufficient to support the trial court's finding that she did not have a contract with appellees, Shirvani points to the July 5 email in which Craddock wrote: "My clients will purchase each of your clients' entire membership interest. . . ." When asked about his reference to "my clients," Craddock testified:

> Well, the - - the purchaser was Healthcare Holdings. You'll see that in the very first draft of the agreement . . . At this point in time, I was representing Healthcare Holdings, I was representing Celebrity, and I was -- and I was, also, representing Fred and Eric and - - and - - Eric Montesi and Jeff Presley in the other litigation.

Shirvani argues the use of the plural term "clients" by Craddock shows he represented Healthcare Holdings and all appellees, and, therefore, the trial court erred by not finding each of them to be a party to the contract. Additionally, she

–16–

argues that while each individual appellee testified at trial that Craddock was not representing them individually, their testimony was impeached by their contradictory testimony from their depositions.

At trial, Fred testified that on July 5, Craddock was not representing him individually; Craddock was representing Healthcare Holdings. He explained the purchase of the membership interest for $1.2 million "was a Healthcare Holdings issue, not - - not a - - not me personally issue." Fred stated Craddock "wasn't working for me personally. He was working for Healthcare Holdings and my position as chairman of the board of Healthcare Holdings." When asked whether he personally would have purchased Shirvani's interest, Fred responded: "Absolutely not." He also testified Presley and Eric would not have purchased Shirvani's interests individually. However, when Fred was asked during his deposition whether Craddock was "your attorney," he answered affirmatively.

Eric testified Craddock had authority to act on behalf of Healthcare Holdings, but no one else. Craddock was not his personal attorney and did not represent Fred or Presley personally. In his deposition, Eric testified Craddock was the attorney for all defendants named in the case. Eric also testified he believed the reference to "clients," in Craddock's July 5 email meant Healthcare Holdings and Celebrity.

Additionally, Cortez's June 30 email states the parties "have agreed to sell 100% of Dr. Shirvani's interests in your client's company in exchange for $1.2

million dollars. . ." This email indicates a single company, not a collection of entities and individuals, would purchase Shirvani's interests.

A review of the record shows the evidence on this issue is conflicting. While Fred and Eric testified that Craddock represented each of them, they also testified Healthcare Holdings was the party that would have purchased Shirvani's interest and Craddock did not represent them individually for purposes of that negotiation. Emails between the lawyers use the terms "[m]y clients" and "your client's company." The subject line of the July 5 email only referenced Healthcare Holdings. The trial court, as fact finder, was the sole judge of the credibility of the witnesses and was entitled to take into consideration all the facts and surrounding circumstances in connection with the testimony of each witness and accept or reject all or any part of that testimony. *See Wyde*, 566 S.W.3d at 894.

Based on this record, we conclude Shirvani did not meet her burden to show, as a matter of law, all vital facts support her conclusion that appellees (along with Healthcare Holdings) were parties to the contract to purchase her interest. *See id*. We also conclude she did not show the evidence against the trial court's finding is so contrary to the evidence as to be clearly wrong and manifestly unjust. *See id.* We conclude the evidence is legally and factually sufficient to support the trial court's finding that Shirvani did not have a contract with any appellee. We overrule Shirvani's first issue.

Shirvani asserts in her second issue that the trial court erred by concluding she was not entitled to recover attorney's fees from the individual appellees on her breach of contract claim. Because we conclude the evidence is sufficient to support the trial court's finding the individual appellees were not parties to the contract, we conclude Shirvani was not entitled to recover attorney's fees from appellees. *See Ashford Partners, Ltd. v. ECO Res., Inc*., 401 S.W.3d 35, 40 (Tex. 2012) ("Indeed, we have said that to qualify for fees under the statute, a litigant must prevail on a breach of contract claim and recover damages."). We overrule Shirvani's second issue.

CONCLUSION

We affirm the trial court's judgment.

/Erin A. Nowell/
ERIN A. NOWELL
JUSTICE

Whitehill, J, concurring in the judgment only

190192F.P05

–19–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

SHIVA SHIRVANI, Appellant/Cross-Appellee

No. 05-19-00192-CV        V.

CELEBRITY HEALTHCARE MANAGEMENT, LLC, FREDERICK T. MONTESI III, FREDERICK T. MONTESI IV, JEFFREY B. PRESLEY, AND ANCONA HOLDINGS, LLC, Appellees

and

HEALTHCARE HOLDINGS, LLC, Cross-Appellant

On Appeal from the County Court at Law No. 5, Dallas County, Texas
Trial Court Cause No. CC-17-04895-E.
Opinion delivered by Justice Nowell. Justices Bridges and Whitehill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.


Judgment entered this 16th day of April, 2020.