**AFFIRMED and Opinion Filed August 27, 2020**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-19-00238-CV**

**BRIAN POTASHNIK, SOUTHWEST HOUSING DEVELOPMENT COMPANY, INC., SOUTHWEST HOUSING MANAGEMENT CORPORATION, INC. A/K/A AND D/B/A SOUTHWEST HOUSING MANAGEMENT COMPANY, INC., AND AFFORDABLE HOUSING CONSTRUCTION, INC., Appellants**
**V.**
**JEFFREY W. CARPENTER, Appellee**

**On Appeal from the County Court at Law No. 5**
**Dallas County, Texas**
**Trial Court Cause No. CC-08-02072-E**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Nowell, and Evans
Opinion by Justice Evans

After an eight-day jury trial, Brian Potashnik, Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc., a/k/a and d/b/a Southwest Housing Management Company, Inc., and Affordable Housing Construction, Inc. appeal from an adverse judgment on Jeffrey W. Carpenter's breach of contract claim against them. In two issues, appellants challenge the legal sufficiency of the evidence to support the jury's finding that the

parties formed an enforceable agreement. After reviewing the record, we affirm the trial court's judgment for the reasons that follow.

BACKGROUND

Brian and Cheryl Potashnik[1] operated the various appellant companies which developed, owned, and managed affordable housing complexes. In 2006, Brian and Cheryl decided to sell their business. At that time, Jeff Carpenter was the executive vice president of Southwest Housing Management Corporation, Inc. Brian and Cheryl wanted Carpenter and other key employees to stay on until the transfer of management to the ultimate purchaser for the purposes of continuity, which was important to the asset sale. According to Cheryl, when they informed Carpenter and other key employees of their plans to sell, they told them that if the sale was successful and there was money left over at the end of the day, they wanted them to participate in the success of the sale. At trial, Cheryl also admitted she told Carpenter that they intended to pay him a bonus if and when the sale went through. Carpenter similarly testified that in May 2006, when Brian and Cheryl told him about their plans to sell, Brian told him this would be good for both families and that they worked hard and should reap some of the rewards. According to Carpenter, Brian told him he wanted Carpenter to stay because there was a lot to do and Carpenter would be involved in the due diligence and communication between the teams once

---

[1] Cheryl's legal last name is Geiser, but she used Potashnik in business during the relevant time period.

a buyer was selected. Brian further told Carpenter that once they selected a buyer and knew the numbers better, they would put together a very lucrative bonus program for Carpenter's efforts. Brian and Carpenter shook hands after that first conversation about the sale. Another executive testified at trial that Brian later told him that if the transactions went well, Carpenter might not have to work again.

Carpenter testified that on October 13, 2006, Brian informed him that a buyer had been selected. Brian then indicated to Carpenter his bonus would be based on the letter of intent they were about to sign with the buyer. Carpenter testified that he and Brian "walked through" the numbers that were based on three percent of the gross sales price of $36 million minus normal closing costs and minus sale proceed bonuses paid to other key employees. Carpenter and Brian did the math and estimated a stay bonus of around $1,020,000. They shook hands after Brian explained the bonus formula. At that time, the anticipated closing date for the transaction was spring/summer 2007. The next business day, Carpenter approached Brian to ask about increasing the bonus from three percent to five percent. Brian rejected the idea of five percent, stating it would have to stay at three percent because that was what was approved, "we've committed to it," and he could not do any more than that.

At some point while the sale was pending, Carpenter and the sellers learned definitively that Carpenter would not have a position with the buyer because the buyer had its own person for Carpenter's job. Subsequently, Carpenter was

approached by another company that tried to recruit him immediately with a higher starting base salary than he was earning at the time. Nevertheless, Carpenter testified he declined the offer because he was "a man of his word," said he would stay on, and was not willing to walk away from the three percent stay bonus and back-earned bonuses.[2] At trial, Jeff Richards, the recruiter for the company, confirmed Carpenter would not start the new job immediately because he had a considerable amount of money coming to him from his current employer if he stayed on.

In late September/early October 2007, Carpenter learned from Brian and Cheryl that criminal indictments were looming against them and the business was losing up to $1 million per month on their personal legal defense fees.[3] The sale of the business, which was initially expected to close in the spring/summer of 2007, was delayed, and the management transition from appellants to the new buyer was set for November 1, 2007. At trial, Cheryl confirmed that they wanted Carpenter to stay on, so they intended to pay him a bonus to work through a certain point in connection with the asset sale which ultimately was the point in which the management of the business was transferred to the new buyer.

Carpenter testified that he met with Brian on October 12, 2007 at which time Brian acknowledged that Carpenter had earned both his three percent bonus as well

---

[2] The jury found against Carpenter on the back-earned annual bonuses.

[3] The FBI had previously searched appellants' offices in 2005, but Brian and Cheryl assured Carpenter they had done nothing wrong.

as the back-earned bonuses. On October 21, 2007, Carpenter met Brian and Cheryl for dinner and they told him he would get paid when they get paid, i.e., at the closing. Cheryl again reassured Carpenter she "would never screw [him]." Cheryl testified that October 31, 2007 was the last day they needed Carpenter to stay on to help with the asset sale. It is undisputed that Carpenter worked for appellants through October 31, 2007. The next day, on November 1, Carpenter received his termination paperwork/severance agreement offering him $50,000 and no other payments if he released all potential claims against appellants. Carpenter did not sign the agreement and ultimately filed this breach of contract lawsuit.

After a jury trial consisting of five days of testimony from various witnesses and other evidence, the jury answered the following question in Carpenter's favor:

> QUESTION 4
>
> Did any of the defendants named below and Jeff Carpenter agree on October 13, 2006 to pay Jeff Carpenter:
>
> 1. 3% of the total of: gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees
>
> 2. if Jeff Carpenter would stay as long as needed on[sic] to help make the asset sale happen
>
> An agreement may be oral, written, or partly oral and partly written.
>
> In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.
>
> The written agreement with Southwest Housing Management may be modified by a later oral agreement, even though it provides that it can be modified only in writing.

The trial court rendered judgment on the jury's verdict in favor of Carpenter, awarding him $928,020.76 in actual damages plus pre- and post-judgment interest, attorney's fees, and conditional appellate attorney's fees. Appellants then filed this appeal challenging the legal sufficiency of the evidence to support the jury's affirmative finding in question four.

ANALYSIS

In their two issues on appeal, appellants contend the evidence is legally insufficient to support the jury's "yes" answer to Question 4. Because appellants challenge the legal sufficiency of an adverse finding on an issue on which they did not have the burden of proof, they must demonstrate that there is no evidence to support the finding. *See Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014). Evidence is legally sufficient to support a jury's verdict when it would allow reasonable and fair-minded jurors to reach the challenged finding. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When we review a finding for legal sufficiency, we consider the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See id.*

In their first issue, appellants argue there is no evidence to support the jury's finding that the parties formed a contract on October 13, 2006. They contend Carpenter's own admission that he asked Brian for five percent of sales revenue on the next day, October 14, 2006, "is fatal to the jury's finding that the parties reached

an agreement on October 13." Appellants specifically rely on the following Carpenter testimony to establish conclusively the parties never reached an agreement on October 13:

Q. So what's the date of your asking for five percent, sir?

A. It was the next business day after October 13th.

Q. So October 14 you were still negotiating, correct?

A. I believe so.

Appellants assert this evidence demonstrates as a matter of law there was no meeting of the minds to prove the parties agreed that Carpenter would be paid three percent of gross asset sale revenue to sellers, less normal closing costs, less sale proceeds bonuses paid to employees. We do not agree that this lone statement by Carpenter, taken out of context and ignoring multiple days of testimony and numerous admissions by Brian and Cheryl, precludes the jury's finding.

To prove the existence of a valid contract, a party must establish an offer was made, the other party accepted the offer, the parties had a meeting of the minds on the essential terms of the contract (mutual assent), each party consented to the terms, and the parties executed and delivered the contract with the intent that it be mutual and binding. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018). An action for breach of contract may involve disputes on any combination of these requirements, as well as a number of defenses that can be asserted by a defendant. *Id*. Here, appellants challenge the legal sufficiency of the

–7–

evidence with respect to the mutual assent or meeting of the minds requirement to contract formation. Whether the parties reached an agreement is a question of fact. *See Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 72 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

Carpenter testified that on October 13, 2006, Brian informed him of the specifics of the bonus he would receive and they walked through the math. The bonus was based on the letter of intent that was going to be signed and would equal three percent of the gross sales price of $36 million minus normal closing costs, including items like broker fees, title fees, legal fees, and bonuses or severances paid to other employees. Carpenter testified they estimated his bonus to be about $1,020,000. At that time, the two shook hands on the deal. Brian never stated the deal had to be in writing. Cheryl also admitted that they intended to pay Carpenter a bonus out of sales proceeds when the sale went through. According to Carpenter, the next day he went to Brian's office and asked to raise the percentage from three percent to five percent. Brian responded that "it would have to stay at three percent, that's what we talked about, that's what I approved, and we've committed to it." Carpenter also testified that Brian said "he has another person that he has to approve or . . . work through. She can – it's been approved at three percent and that's what we discussed, that's what we talked about, and I can't do five percent." There is no evidence that Carpenter rejected the three percent on which they had already agreed. In addition to this evidence, the jury heard testimony from Cheryl that, to encourage

key employees to stay on through the sale, they talked to the employees and "let them know that if, at the end of the day, the sale was successful and there was money left over at the end of the day that we wanted them to participate in the success of the sale and of the business." Carpenter also testified that Brian told him that if he stayed, and when they settled on a buyer, "we'll put together a very lucrative bonus program for you for your efforts."

According to Carpenter, when he and Brian were in Las Vegas around January 12, 2007 they discussed putting the deal in writing, and Brian said it was going to be done but attorneys were too busy. Brian then stated to Carpenter, "Jeff if it's that important to you, you know, I'll write it on the back of a napkin." But there were only cloth napkins available so Carpenter decided to trust Brian on the oral deal. Moreover, Carpenter stated that, on October 12, 2007, Brian told him that Carpenter had fulfilled his obligation and had earned his three-percent bonus and back-earned bonuses as of that day. Another executive, Deepak Sulakhe, testified that Brian told him that if the transaction went well, Carpenter might not have to work again.

Carpenter's testimony that he attempted to get Brian to agree to a five percent bonus after they agreed to three percent the day before is not conclusive evidence that the parties were still negotiating and thus never reached an agreement. Instead, the jury could have viewed Carpenter's statement as seeking a modification of the original agreement that Brian rejected. At best, this testimony could be viewed as conflicting with other evidence. In a legal sufficiency analysis, we assume the jury

resolved conflicting testimony in a manner favorable to the verdict. *See City of Keller*, 168 S.W.3d at 819. We resolve appellants' first issue against them.

In their second issue, appellants contend that because the terms of the purported agreement are too indefinite, it is unenforceable as a matter of law. Specifically, appellants argue that evidence Carpenter "would stay on as long as needed to make the asset sale happen" in exchange for three percent of undefined gross asset sale revenue to sellers minus undefined normal closing costs was, at best, a promise to work together and not an enforceable contract because the agreement does not reflect a meeting of the minds on the services to be provided.

We agree with appellants that in order to be legally enforceable, a contract must be sufficiently definite in its terms to allow a court to understand what a promisor undertook. *See T.O. Stanley Boot Co. Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). The parties must agree to the material terms of the contract before a contract can be enforced and where an essential term is open for future negotiation, there is no binding contract. *Id.* But a contract need only be definite and certain as to those terms that are essential and material to the agreement. *Fischer v. CTMI L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016). When a material or essential term is missing or not certain when the contract was allegedly formed, the contract will fail for indefiniteness. *See Marx v. FDP, LP*, 474 S.W.3d 368, 376 (Tex. App.—San Antonio 2015, pet. denied).

In analyzing whether a contract is sufficiently definite to be enforceable, we are guided by the following five basic principles: (1) we may not rewrite the parties' contract; (2) because the law disfavors forfeitures, whenever the contract language is reasonably susceptible to an interpretation that is sufficiently definite, we will apply that interpretation, (3) we will imply terms that can be reasonably implied, (4) terms that appear indefinite may be given precision by usage of trade or by course of dealing between parties, and (5) partial performance under an agreement may remove uncertainty and establish an enforceable contract; in fact, a party's actions "[i]n reliance on an agreement may make a contractual remedy appropriate even though uncertainty is not removed." *Fischer*, 479 S.W.3d at 239–40 (internal citations omitted).

In support of their position, appellants focus on the meaning of Carpenter's promise to stay on to "help make the asset sale happen" after Brian and Cheryl informed him they were selling the companies. They argue the meaning of the promise cannot be ascertained because it provides no objective criteria or guidelines by which a court can measure Carpenter's efforts. After reviewing the record before us, we conclude that the evidence was legally sufficient to establish the material terms of the agreement between appellants and Carpenter were sufficiently definite and clear, no terms were left open for future negotiation, and the parties mutually agreed to the material terms.

To the extent that appellants rely on Carpenter's testimony that he was still negotiating on October 14 to conclusively establish there was no meeting of the minds, we have already considered and rejected this argument in our resolution of their first issue.

Appellants also argue the duration for Carpenter's performance was also indefinite because of Carpenter's testimony that:

> A. Well, we did have an agreement for me to help assist in closing the sale. And it -- depending on the time frame, it was going to be either the sales closing or until my time is no longer needed, knowing that I was not going to have a position to go to. So it was a floating target.
>
> Q. All right. None of that was agreed to when you had the bump, shake, oral agreement with Mr. Potashnik in October 13, 2006?
>
> A. We had -- we had a targeted frame of closing in, as I said before, in April, May of 2007. And as we got closer to that it became more of a moving target.

They assert this testimony establishes that the parties did not agree on the time for performance or how long Carpenter had to stay on. We do not agree. That the parties did not have a specific date on which Carpenter's performance would end does not render the agreement too indefinite to be enforceable. Carpenter also testified that when Brian informed him that he was going to sell the business, he told Carpenter that he wanted Carpenter to stay and do his job. Brian specifically told Carpenter that Carpenter would be involved in the due diligence and communication between the teams once a buyer was selected. Based on the evidence, a reasonable jury could have determined that the parties agreed that if Carpenter continued to do

his job and perform these other responsibilities until the asset sale closed or he was no longer needed, he would be entitled to the three percent bonus. Carpenter and others testified that even when Carpenter was offered another job at a more lucrative base salary, he did not quit his position but instead stayed through October 31, 2007, the day before the management transition to the buyer. Moreover, there was evidence that about ten days earlier, on October 21, 2007, Brian and Cheryl confirmed to Carpenter that he sufficiently performed his obligations and would get paid his three percent bonus at closing, when they got paid.

We likewise are unpersuaded by appellants' argument that the agreement's payment term was not clear or definite enough to be enforceable because there was no understanding as to how "normal closing costs" were to be determined. Carpenter testified that Brian and he estimated the amount of normal closing costs to be about $1 million when they went through the math to calculate the bonus on October 13 and there is no indication that these costs would not be able to be ascertained with specificity at the time of the closing of the asset purchase agreement when the bonus was to be paid.

The supreme court's decision in *Vanegas v. American Energy Services* also supports our conclusion that an enforceable contract exists. 302 S.W.3d 299, 303–04 (Tex. 2009). In *Vanegas*, the supreme court concluded the employer's promise to pay employees a five percent bonus from sale/merger proceeds was enforceable upon the employees' performance of staying until the sale. *Id*. at 304. The court

–13–

reasoned whether the promise was illusory at the time it was made is irrelevant; what matters is whether the promise is enforceable by the time of breach. *Id*. at 303. We conclude the material terms of the contract are sufficiently definite to enable a court to determine the parties' respective obligations and provide a remedy for the contract's breach. Accordingly, we resolve appellants' second issue against them.

## CONCLUSION

Based on the record before us, we conclude the evidence was legally sufficient to support the jury's finding of an enforceable contract. Accordingly, we affirm the trial court's judgment.


/David Evans/
DAVID EVANS
JUSTICE

190238F.P05



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

BRIAN POTASHNIK,
SOUTHWEST HOUSING
DEVELOPMENT COMPANY,
INC., SOUTHWEST HOUSING
MANAGEMENT CORPORATION,
INC. A/K/A AND D/B/A
SOUTHWEST HOUSING
MANAGEMENT COMPANY,
INC., AND AFFORDABLE
HOUSING CONSTRUCTION,
INC., Appellants

No. 05-19-00238-CV     V.

JEFFREY W. CARPENTER,
Appellee

On Appeal from the County Court at
Law No. 5, Dallas County, Texas
Trial Court Cause No. CC-08-02072-E.
Opinion delivered by Justice Evans,
Justices Partida-Kipness and Nowell
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Jeffrey W. Carpenter recover his costs of this appeal from appellants Brian Potashnik, Southwest Housing Development Company, Inc., Southwest Housing Management Corporation, Inc. A/K/A and D/B/A Southwest Housing Management Company, Inc., and Affordable Housing Construction, Inc.

Judgment entered August 27, 2020.