# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-20-00399-CV

---

### Caren Burbach, as Independent Executrix of the
### Estate of Catherine RoAnn Cook Stearns, Appellant

### v.

### Zachary Stearns, Appellee

---

### FROM THE COUNTY COURT AT LAW OF BASTROP COUNTY
### NO. 10,840, THE HONORABLE BENTON ESKEW, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Caren Burbach, as Independent Executor of the Estate of Catherine RoAnn Cook Stearns, appeals from the trial court's final judgment determining that appellee Zachary Stearns is entitled to specific performance of a Rule 11 agreement. For the following reasons, we will affirm the judgment.

### BACKGROUND

This suit arises out of the administration of the Estate of Catherine RoAnn Cook Stearns (Cathy) and centers on the payment of the Estate's administration expenses. Cathy died in 2015. Zachary Stearns (Zachary) is Cathy's surviving husband, Austin Stearns (Austin) is the couple's adult child, and Burbach is Cathy's sister. Cathy's will directed that Burbach be appointed executor if Cathy's father (Roy Cook) predeceased her, which Cook did by about seven months, and the trial court appointed Burbach independent executor in September 2015.

Burbach is also the executor of Cook's estate. Cathy's will bequeathed her separate property to Austin and the remainder of her property to Zachary. Cathy's will directed that Estate administration expenses and debts be paid from the community property. The Estate consists primarily of real property.

In March 2016, Burbach filed a motion for payment of debts and expenses seeking to compel Zachary to pay about $42,000 for administration expenses and debts from community assets over which he had control. Zachary filed a contest to the motion, arguing that Burbach was attempting to improperly allocate appraisal costs associated with Roy Cook's estate-tax return to the administration costs for Cathy's Estate, which would "improperly reward" Roy Cook's estate. Zachary alleged that Burbach had intentionally delayed administering Roy Cook's estate and had a conflict of interest because she was serving as independent executor of both estates. After an August 2016 hearing on Burbach's motion, the parties reached an agreement about payment of debts and expenses, and the trial court rendered an agreed order requiring Zachary to pay about $39,000 to Burbach as independent executor.

In November 2016, Burbach filed a second motion for payment of debts and expenses, alleging that Zachary had refused to pay additionally incurred expenses of more than $136,000. At a January 25, 2017 hearing on this motion, the parties entered into an oral Rule 11 agreement (Agreement), which Burbach's attorney, Michael Navarre, read into the record in open court. The Agreement included the following relevant provisions:

- Navarre's "understanding" was that Zachary's attorney (Ernest Bogart) "has approximately $83,000 in his trust account. That amount will be paid to Ms. Burbach this week. An additional $83,000 will be paid on closing."

- "Closing will occur within 10 business days" and "will involve, in addition to the payment of $83,000 to Ms. Burbach . . . will include quitclaim, other deeds for the Lexus,

2

for the house, for the six or seven other commercial properties and personal properties. [Bogart] will draft all of the papers necessary for that, and that will be reviewed by Ms. Burbach's counsel."

- "The agreement is that there will be no further expenses or fees paid for the administration of the estate, to be paid by [Zachary] Stearns out of the community property, with two exceptions [pertaining to the possibility of an IRS audit or a dispute concerning the partition of the real property]."

- Zachary is "not waiving" his claim for the "burial plot," and "the community property will be responsible for" any income-tax liability regarding the community property.

- "Then there's also a list of personal property items . . . that [Zachary] Stearns has agreed to provide to Ms. Burbach . . . if he still has them . . . [including specified items of personal property]," and Zachary agrees to allow Burbach's husband and daughter "to go to the house and look for other" items.[1]

The trial court approved the Agreement and made it an order of the court, and Zachary's counsel represented again to the court that he would "draft the documents that reflect the transfers."

On January 8, 2019, Zachary filed a motion seeking to enforce the Agreement's terms and compel distribution of the community-property portion of the Estate. In his motion, he alleged that he fully performed under the Agreement by tendering to Burbach both required payments; prepared and delivered title-transfer documents for "all community property" to Navarre, who approved them; and was prepared to allow Burbach's husband and daughter to enter the home to "pick up the personal property" identified in the Agreement but that Burbach improperly attempted to modify the Agreement by asserting that she and/or her mother should be allowed to enter the home also. Zachary alleged that the parties had agreed that on the date of the personal-property pickup, Burbach's husband would deliver the original executed title-transfer documents, which Burbach had electronically executed. However, this final step of the

---

[1] Except for the bequest to Austin of her separate property, Cathy's will specifically bequeathed all of her tangible personal property to Zachary.

3

Agreement was allegedly not completed because of the dispute between the parties about who could enter the home.

While the cause was pending, Burbach, Austin, and Zachary filed pleadings and motions, including Austin's petition to remove Burbach as executor—in which Zachary joined—and, in December 2018, Burbach's third motion for payment of debts and expenses and motion to compel Zachary to produce requested documents. In May 2019, Zachary filed an answer and counterclaim to Burbach's third motion for payment of debts and expenses. In his counterclaim, he re-asserted the allegations he made concerning Burbach's alleged failure to comply with the Agreement. He sought damages and an order compelling Burbach to deliver the title-transfer documents to thirteen vaguely described properties (one of which was an "Assignment of Interest in Community Property," eleven of which were tracts of real property identified by acreage and county or merely by county or state, and one of which was an automobile—a 2013 Lexus). Burbach did not file an answer to the counterclaim.

In August 2019, Zachary filed a motion for preferential setting on his counterclaim. The counterclaim was set for a separate trial on June 1, 2020. On the day of trial, Burbach filed a trial brief that, for the first time, raised arguments of "no meeting of the minds," repudiation, and fraudulent inducement. Because there was no meeting of the minds, Burbach argued in her brief, "the Agreement never constituted an enforceable agreement." After opening statements at trial, Burbach sought leave to amend her pleadings to add four affirmative defenses: failure of performance, no meeting of the minds, breach, and repudiation. Over Zachary's objection, the trial court granted Burbach leave for the trial amendment.

In a final judgment disposing of "all issues and claims related to Zachary," the trial court determined that the Agreement is enforceable and valid, Zachary did not materially

4

breach it, and all defenses raised by Burbach are "without merit." The trial court's judgment ordered Burbach to deliver to Zachary within thirty days "all documents of title and possession of each of the items of real or personal property listed in Exhibit A to the judgment"—which were the same thirteen properties (including the Lexus, Cathy and Zachary's home, and the Estate's "interest in community property") identified in Zachary's counterclaim attachment— that were "originally executed by [Burbach] and approved by the parties." Burbach perfected this appeal.

## DISCUSSION

Burbach raises five issues on appeal: (1) the Agreement is unenforceable because there was no "meeting of the minds," (2) the Agreement is unenforceable because it violates the statute of frauds, (3) there is legally and factually insufficient evidence to support the judgment because it compels the conveyance of more property than set forth in the Agreement, (4) there is legally and factually insufficient evidence to support the judgment because closing never occurred and Zachary delayed too long in seeking to enforce the Agreement, and (5) there is legally and factually insufficient evidence to support the judgment because Zachary repudiated the agreement or procured it by fraud.

We begin by noting that Burbach did not request findings of fact or conclusions of law, and the trial court did not issue any. Therefore, "all facts necessary to support the judgment and supported by the evidence are implied," *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002), and we will affirm the judgment if it can be upheld on any legal theory supported by the evidence, *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). An implied finding is supported by legally sufficient evidence if more than a scintilla of evidence

5

supports it and by factually sufficient evidence unless it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Leonard v. Abbott*, 171 S.W.3d 451, 459 (Tex. App.—Austin 2005, pet. denied).

### Burbach's first and third issues

In her related first and third issues, Burbach contends that there was no evidence that she and Zachary had a "meeting of the minds" about which real property was to be conveyed to him because the Agreement only indefinitely described the real property: "quitclaim, other deeds for the Lexus, for the house, for the six or seven other commercial properties and personal properties." She contends that the Agreement constituted, at most, a mere "agreement to agree" about which real properties would be conveyed and was not sufficiently definite to be enforceable. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("In order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook. . . . Where an essential term is open for future negotiation, there is no binding contract."). Further, she contends, the trial court's judgment ordered her to convey eleven specific real properties despite the Agreement's reference to "six or seven" and that the judgment, therefore, is not supported by legally or factually sufficient evidence.

A "meeting of the minds" is required for a contract to be valid and thus enforceable. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018); *T.O. Stanley Boot*, 847 S.W.2d at 221. A meeting of the minds occurs if there is a mutual understanding and assent to the agreement regarding the subject matter and the essential terms of the contract. *City of The Colony v. North Tex. Mun. Water Dist.*, 272 S.W.3d 699, 720 (Tex.

6

App.—Fort Worth 2008, pet. dism'd). Whether there is a meeting of the minds is a question of fact, *Franco v. Ysleta Indep. Sch. Dist.*, 346 S.W.3d 605, 608 (Tex. App.—El Paso 2009, no pet.), and whether the parties came to a meeting of the minds is based on an objective standard of what they said and did, *see In re S.M.H.*, 523 S.W.3d 783, 795 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

Also, courts have recognized that where one party has performed his part of a contract, the "law favors finding agreements sufficiently definite for enforcement," and when the parties' actions demonstrate that they intended to create a binding agreement—even if one or more terms are left to be agreed upon—courts will "endeavor, if possible, to attach a sufficiently definite meaning to the bargain." *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 240 (Tex. 2016) (quoting *Tanenbaum Textile Co. v. Sidran*, 423 S.W.2d 635, 637 (Tex. App.—Dallas 1967, writ ref'd n.r.e.)). Finally, the law disfavors finding contracts invalid, contracts are construed to avoid forfeitures, and "if the parties clearly intended to agree and a 'reasonably certain basis for granting a remedy' exists, [courts] will find the contract terms definite enough to provide that remedy." *Id.* at 239 (quoting Restatement (2d) of Contracts § 33 cmt. b.) (1981). After reviewing the entire record, we conclude that sufficient evidence supports the trial court's implied finding that the parties had a mutual understanding about which properties the Agreement covered, and there was a "reasonably certain basis" for the trial court to have rendered its judgment.

We first note the context in which the Agreement was reached: at the hearing on Burbach's second motion for expenses and debts. Burbach, as independent executor, is charged with administering the Estate per the terms of Cathy's will, which indisputably bequeathed *all* of Cathy's community-property interest (both real and personal) to Zachary. The

7

Estate's tax return identified ten parcels of real property co-owned by the Estate and Zachary, plus the couple's home. There had been ongoing disputes between Zachary and Burbach about the administration expenses Burbach was incurring, which the will required to be paid from Zachary's share of the Estate. Next, we note that while the Agreement did not specifically identify the community-estate properties for which Burbach was agreeing to deliver executed deeds, it did specify that Bogart would "draft all of the papers necessary for" the closing and transfer by necessary deeds of the real and personal properties at issue and that Navarre would review the papers prior to closing.

The evidence showed that within a week of the Agreement, Bogart sent Navarre deeds or title documents he had prepared for conveyance of the same thirteen properties (including the Lexus) identified in the judgment. The trial court admitted evidence demonstrating that Navarre approved the deeds and returned via email electronic copies of them executed by Burbach, noting that the hard-copy originals would be provided at the parties' upcoming in-person meeting (i.e., closing) at Zachary's residence to convey Cathy's personal effects identified in the Agreement. Evidence showed that the in-person meeting was scheduled for March 11, 2017, but a dispute arose between the parties about who was permitted to attend, and the meeting thereafter never occurred.[2]

---

[2] Correspondence between Bogart and Navarre demonstrated that the meeting at Zachary's house was to occur at 3:00 p.m. on March 11, at which time Burbach's husband Ed would provide Zachary the "executed originals" of the deeds and title documents already exchanged electronically between the parties and would pick up Cathy's personal effects identified in the Agreement. The evening before the would-be meeting, Zachary sent a text message to Ed stating that (a) he did "not understand" why Burbach's mother was coming to the meeting "as she was not a part of the rule 11 agreement," (b) he did not have some of the particular personal effects Burbach had requested, and (c) if Ed's understanding of what would "transpire" the next day was "any different" than what Zachary had outlined in his text message, it would be a "waste" of each other's time. The next morning, Navarre sent an email to Bogart

8

Additionally, evidence showed that Bogart sent the first required check—in the amount of $85,314.54—immediately after the court approved the Agreement; Burbach cashed the check a few days later. Bogart sent Navarre the second check—in the amount of $80,685.46—fewer than ten days later. The letter enclosing the second check placed no conditions on its cashing. However, Navarre testified at trial that Bogart orally requested the check not be cashed until the title documents were provided at closing. In contrast, Bogart testified that he had "no recollection" of ever making an oral request that the second check not be cashed until closing and did not believe that he had made such "oral agreement." As of trial, the second check had not been cashed.

For the first time on appeal Burbach takes issue with the second check being less than the $83,000 specified in the Agreement. However, the only reasonable construction of the Agreement's reference to payments is that the parties intended Zachary to pay a total of $166,000. *See Frost Nat'l Bank v. L & F Distrib., Ltd*., 165 S.W.3d 310, 312 (Tex. 2005) (Courts "construe contracts from a utilitarian standpoint" and "avoid, when possible and proper, a construction that is unreasonable, inequitable, or oppressive."); *see also Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 480 (Tex. 2019) (noting that if contract's language "can be given a certain or definite legal meaning or interpretation" it will be construed as matter of law, and only if contract has two or more reasonable constructions is it ambiguous); *Shamrock Psych. Clinic, P.A. v. Texas Dep't of Health & Hum. Servs.*, 540 S.W.3d 553, 560

calling off the afternoon's house meeting, citing Zachary's text message as the reason. Later correspondence shows that the dispute between the parties about which of Cathy's personal effects were to be provided and who was entitled to enter the home continued for at least several months with no resolution. However, the correspondence does not reflect any dispute between the parties about which real properties were included in the Agreement or about whether Zachary had tendered the amount required by the Agreement.

9

(Tex. 2018) (per curiam) (noting that courts construe Rule 11 agreements under same rules as for contracts). The Agreement references Navarre's "understanding" that Bogart "has approximately $83,000 in his trust account" and immediately follows it with a directive: "*[t]hat amount* will be paid" to Burbach within the week. (Emphasis added.) While Burbach argues that the Agreement's reference to "that amount" means the unspecific "approximate" amount actually in Bogart's trust account when the Agreement was dictated into the record, such construction is not reasonable because it is unlikely that Burbach agreed to receive a total amount less than $166,000 in the event that Navarre's "understanding" of the amount in Bogart's trust account was in error (and on the low side). Rather, the only reasonable construction is that the reference to "that amount" is to the specific dollar amount of $83,000. Zachary's first payment, then, of $85,314.54 comprised both the first required $83,000 payment plus credit towards the second required $83,000 payment. We conclude that sufficient evidence supports the trial court's implied finding that Zachary tendered the total required amount and did not breach the Agreement in this regard.

While on its face the Agreement's reference to "six or seven other commercial properties and personal properties" is indefinite, we conclude that the record nonetheless contains legally and factually sufficient evidence to support an implied finding that the parties agreed Burbach would deliver executed deeds to the thirteen properties identified in the judgment in exchange for Zachary's payment of $166,000 and transfer of the specified items of personal property. This evidence includes the parties' above-cited post-Agreement conduct, *see Grindinger v. Kixmiller*, No. 2-06-221-CV, 2007 WL 529954, at *3 (Tex. App.—Fort Worth Feb. 22, 2007, pet. denied) (mem. op.) (including parties' conduct subsequent to execution of contract in its consideration of whether evidence of meeting of minds was sufficient), tax

10

documents identifying the total real-property holdings co-owned by Zachary and the Estate, and Zachary's full performance of his part of the bargain (i.e., tendering both payments, drafting and sending Navarre the deeds, and providing a date for the personal-property meeting at the house).[3] The record supports an implied finding that there was a meeting of the minds and a reasonably certain basis to require Burbach to provide Zachary with executed originals of the thirteen deeds and title-transfer documents that the parties had already each approved and that Burbach had electronically executed. Accordingly, we overrule Burbach's first and third issues.

### *Burbach's failure to preserve second issue*

As to Burbach's second issue—in which she asserts that the Agreement is unenforceable under the statute of frauds—we agree with Zachary that Burbach did not preserve the issue for our review. The statute of frauds is an affirmative defense that Burbach failed to plead and addressed only in her closing argument. *See* Tex. R. Civ. P. 94 (listing statute of frauds as affirmative defense and requiring defendant to plead it); *McMahan v. Izen*, No. 01-20-00233-CV, 2021 WL 3919219, at *10 (Tex. App.—Houston [1st Dist.] Sept. 2, 2021, no pet.) (mem. op.) (noting that affirmative defenses are waived if not pleaded); *Miller v. Argumaniz*, 479 S.W.3d 306, 310 (Tex. App.—El Paso 2015, pet. denied) (holding that defendant waived statute-of-frauds defense by not pleading it and raising it only in summary-judgment motion).

---

[3] We conclude so despite the evidence of Zachary's February 2018 deposition taken in a dispute about a family burial plot, about which Burbach questioned Zachary during trial and which Burbach cites to support her position. In his deposition and in response to Navarre's questioning, Zachary testified there was "no chance" the Agreement as read into the record was "actually" the agreement the parties made. However, on cross-examination Zachary introduced into evidence the errata sheet from his deposition, in which he clarified that the Agreement as read into the record was correct, and he explained in his cross-examination that he had not recently looked at the Agreement before his deposition and was misled by Navarre's question.

11

We, therefore, do not reach Burbach's second issue. *See* Tex. R. Civ. P. 94; Tex. R. App. P. 33.1.

***Burbach's fourth issue***

In her fourth issue, Burbach contends that (a) the trial court's judgment is not supported by legally or factually sufficient evidence because the closing referenced in the Agreement did not occur within the time specified (ten business days) or within a reasonable time and (b) Zachary delayed too long in enforcing the Agreement. However, time is not ordinarily of the essence, and even a date stated for performance does not mean that time is of the essence. *See Proctor v. Quality Signs, Inc.*, No. 01-15-00861-CV, 2017 WL 2871782, at *4 (Tex. App.—Houston [1st Dist.] July 6, 2017, no pet.) (mem. op.). Instead, for timely performance to be a material term of a contract, the contract must expressly make time of the essence or there must be something in the nature or purpose of the contract and circumstances surrounding it making it apparent that the parties intended time to be of the essence. *Id.*

We conclude that sufficient evidence supports the trial court's implied finding that time was not of the essence. *See id.* ("Unless the contract expressly makes time of the essence, the issue is a fact question." (quoting *Breof BNK Tex., L.P. v. D.H. Hill Advisors, Inc.*, 370 S.W.3d 58, 64 (Tex. App.—Houston [14th Dist.] 2012, no pet.)); *Pelco Constr. Co. v. Chambers County*, 495 S.W.3d 514, 522 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (noting that whether timely performance is material term of contract is question of fact); *see also Texas Black Iron, Inc. v. Arawak Energy Int'l Ltd.*, 566 S.W.3d 801, 814 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) ("Time is not ordinarily of the essence, and even a date stated for performance does not mean or imply time is of the essence."); *see also Zac Smith & Co. v.*

12

*Otis Elevator Co.*, 734 S.W.2d 662, 666 (Tex. 1987) (noting that appellate courts presume that all questions of fact were found in support of judgment when no findings of fact or conclusions of law are requested or filed). Evidence showed that the parties continued to negotiate about scheduling the house meeting (i.e., closing) for exchange of the title documents and personal effects well after the ten days specified in the Agreement and that Bogart and Navarre corresponded that neither would "complain" about the ten-day deadline not being met.

As to Burbach's alternate contention that the Agreement needed to be performed within a "reasonable time," *see, e.g.*, *Pearcy v. Environmental Conservancy of Austin and Cent. Tex., Inc.*, 814 S.W.2d 243, 246 (Tex. App.—Austin 1991, writ denied) ("Texas courts have repeatedly held that, where a contract does not provide a time for performance, the law will imply that performance must occur within a reasonable time."), we have already concluded that the trial court did not err in impliedly finding that Zachary performed or tendered performance of his obligations, and the record supports the implied finding that such performance or tender occurred within a reasonable time. Evidence shows that the closing did not occur as scheduled because Navarre called it off, and the parties were not able to reschedule it due to a dispute about who was entitled to enter the home. To the extent that Burbach argues that this issue is one of laches—that Zachary delayed too long in seeking to enforce the Agreement, allegedly causing injury to beneficiaries who have been unable to enjoy Cathy's personal effects and the incurring of additional administration expenses—we conclude that she did not plead that affirmative defense and has waived it. *See Custer v. Wells Fargo Bank, N.A.*, No. 03-15-00362-CV, 2016 WL 1084165, at *3 (Tex. App.—Austin Mar. 18, 2016, pet. dism'd w.o.j.) (mem. op.) (holding that laches is waived by failure to plead). We overrule Burbach's fourth issue.

13

*Burbach's fifth issue*

In her fifth issue, Burbach contends that there is legally and factually insufficient evidence to support the trial court's implied findings that Zachary did not repudiate the Agreement or fraudulently induce her into it. Repudiation, or anticipatory breach, is an unconditional refusal to perform a contract in the future, which can be expressed either before performance is due or after partial performance. *New York Party Shuttle, LLC v. Bilello*, 414 S.W.3d 206, 216 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). To avoid enforcement of the Agreement, Burbach had the burden of proving either Zachary's unequivocal refusal to perform it, *see Scientific Machine & Welding, Inc. v. FlashParking, Inc.*, No. 03-20-00431-CV, 2021 WL 5312311, at *5 (Tex. App.—Austin Nov. 12, 2021, no pet. h.) (noting that defendant asserting repudiation as affirmative defense has burden to conclusively establish that plaintiff unequivocally refused to perform), or each of the elements of fraudulent inducement, *see Rogers v. Propst*, No. 01-14-00114-CV, 2015 WL 1245880, at *3 (Tex. App.—Houston [1st Dist.] Mar. 17, 2015, no pet.) (mem. op.) (noting that fraudulent inducement raised in avoidance of contract is affirmative defense and requires proof of each element of fraud). As in common-law fraud, the elements of fraudulent inducement are that the defendant (1) made a material misrepresentation, (2) knowing it was false or without knowledge of its truth and (3) with the intention that the other party rely on it; and that the other party (4) relied upon the misrepresentation and (5) was thereby injured. *See Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018).

When a party attacks the legal sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d

237, 241 (Tex. 2001) (per curiam). We view the evidence in the light most favorable to the fact finding, indulging every reasonable inference that would support it and disregarding contrary evidence unless a reasonable factfinder could not. *Bos v. Smith*, 556 S.W.3d 293, 299–300 (Tex. 2018). When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co.*, 46 S.W.3d at 242. We will set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016).

Burbach cites the following evidence to support repudiation: Zachary's tender of "less than" the full amount of consideration required in the Agreement; Zachary's February 2018 deposition taken in a related dispute about a family burial plot, in which he testified there was "no chance" the Agreement reflected the parties' actual agreement;[4] Zachary's March 11, 2017 text message to Burbach's husband about the next day's house meeting; and Zachary's proposal of a "new" Rule 11 agreement in May 2017 that "dramatically increased the property to be conveyed to him" and would have prevented Burbach and her mother from entering the home, "contrary" to the Agreement's terms.[5] We have already rejected Burbach's argument that

---

[4] As noted supra, Zachary corrected his deposition testimony in an errata sheet to state that the Agreement was accurate, and at trial he explained his misunderstanding of the deposition question.

[5] On May 12, 2017, Bogart sent Navarre a letter entitled "Rule 11 Agreement" in which Bogart proposed a process for "completion" of the original Agreement, including specifying

15

Zachary did not tender the correct amount. We also note that the trial court presumably resolved the conflict between the cited deposition testimony and errata sheet in Zachary's favor, which was within its province as factfinder.[6] As to Burbach's argument about Zachary's text message serving as a repudiation of the Agreement and his proposing a "new" Rule 11 agreement, the trial court could reasonably have considered the text message and "new" Rule 11 proposal—in the context of the parties' subsequent correspondence and failure to complete the closing—as a mere reflection of the devolving relations between the parties about who would be allowed to enter the home. However, we cannot conclude that the cited evidence, considered on balance with the entire record, established as a matter of law that Zachary repudiated the Agreement or that the trial court's implied finding that Zachary did not repudiate the Agreement is against the great weight and preponderance of the evidence.

As to fraudulent inducement, Burbach cites Zachary's testimony at a June 2020 probate hearing in which he explained why he no longer had some of Cathy's personal effects: because during family gatherings at his home in 2015 and 2016, he and Austin allowed Zachary's sisters, nieces, and nephews to choose items to take and keep but he did not know who took which items or keep an inventory. However, Zachary's testimony that he had given away some unspecified personal effects of Cathy before entering into the Agreement constitutes no

which personal effects Ed and his daughter (but not others) could retrieve from the house and identifying the thirteen personal and real-property interests for which the parties had agreed Burbach would provide original, executed deed and title documents. The record does not reflect that Navarre signed the "new" agreement.

[6] Moreover, Zachary's testimony in his deposition occurred well after he had fully performed or tendered performance under the Agreement, when the only outstanding obligations were Burbach's provision of the original title documents and Zachary's provision of the personal effects, which as already noted never occurred because of the parties' unresolved dispute about who could enter the home.

16

evidence of a misrepresentation he made to induce Burbach to enter into the Agreement, especially considering that per the Agreement Zachary consented to give Burbach certain of Cathy's personal effects only "if he still ha[d] them." Furthermore, the cited testimony does not correspond to any representation that Zachary made in connection with the Agreement or its formation, and Burbach has cited no other evidence of one. Therefore, it cannot support the element that Zachary made a material misrepresentation upon which Burbach relied. We accordingly overrule Burbach's fifth issue.[7]

## CONCLUSION

Having overruled the issues that Burbach preserved for our review and that are properly before us, we affirm the trial court's judgment.

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Smith

Affirmed

Filed: February 10, 2022

---

[7] Because we have overruled Burbach's issues, we need not address Zachary's cross-issue, in which he contends that the trial court abused its discretion in granting Burbach leave to raise affirmative defenses for the first time during trial. *See* Tex. R. App. P. 47.1, 47.4.

17